Marie MANDEVILLE, Plaintiff,

v.

CITY OF CORAL GABLES, a municipality, and Ana Baixauli, officially and individually, Defendants.

No. 98–1972–CIV.

United States District Court, S.D. Florida.

June 11, 1999.

George Ware Cornell, Jr., Ft Lauderdale, FL, for plaintiff.

James C. Crosland, Denise Heekin, Miami, FL, Michael Fertig, Miami, FL, for defendants.

### ORDER GRANTING DEFENDANT CITY OF CORAL GABLES' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT ANA BAIXAULI'S MOTION FOR SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court on the Motion For Summary Judgment filed by Defendant City of Coral Gables ("City") on May 14,1999. Defendant Ana Baixauli ("Baixauli") also filed a Motion For Summary Judgment on May 14,1999. Plaintiff submitted a single response to both Motions on June 1, 1999.

### I. Factual and Procedural Background

Plaintiff began her employment with Defendant City's Police Department ("Department") approximately in March 1980. *See* Aff. of Marie Mandeville, at ¶ 2. Except for a brief assignment in the Detective Bureau, she served as a Police Officer in the Patrol Division until 1989. *See id.* In 1989, she was promoted to the position of Sergeant. *See id.* In approximately September 1995, Plaintiff was promoted once again, this time to the position of Lieutenant, and was assigned to the Field Training Program ("FTP") within the Patrol Division. *See id.* Plaintiff alleges that she received satisfactory and above satisfactory reviews throughout her employment with the Department and that she had not been the subject of an Internal Affairs ("IA") complaint until the occurrence of the events which led to this lawsuit. *See id.* at ¶ 3, 11.

Defendant Baixauli was a Major in the Department, who was promoted to Deputy Chief on October 6, 1997. *See* Decl. of Ana Baixauli, at ¶ 2. In addition, she was Commander of the Patrol Division, which gave her policy-making authority over that division. *See id.* at ¶ 5.

In or about December 1994 or January 1995, Plaintiff was subpoenaed as a witness in a sexual harassment lawsuit brought by Sergeant Deena Paris against Police Chief James Butler. In her testimony, Plaintiff discussed the sexual advances Chief Butler made towards her. *See* Mandeville Aff., at ¶ 5. After she gave testified in the *Paris* lawsuit, Plaintiff alleges that Chief Butler warned her that "they are going to come after you now." *See id.* at ¶ 9. Plaintiff alleges that Chief Butler's words rang true and that she became subject to non-stop harassment at work and unwarranted discipline for actions that were not penalized when done by other officers. *See id.* at ¶ 10. Despite this alleged adverse treatment, Chief Butler promoted Plaintiff from Sergeant to Lieutenant in September 1995, eight months after she testified against him in the *Paris* lawsuit. *See* Dep. of Marie Mandeville, at 7. As FTP Lieutenant, Plaintiff was responsible for conducting meetings with trainers, reviewing the work performance of officers and trainees, scheduling officers and trainees, interviewing and selecting candidates for trainer positions, managing the use of overtime, and filing complete and accurate reports in a timely manner. *See* Baixauli Decl., at ¶ 7.

In April 1995, the Department created the Women's Issue Committee ("WIC") in order to address the concerns of its female employees. *See* Mandeville Aff., at ¶ 7. Chief Butler appointed then-Major Baixauli as the WIC's first Chairperson. *See id.* The WIC held its first meeting on April 4, 1995. *See id.* at Ex. 1. In a May 2, 1995 memorandum to Chairperson Baixauli, Plaintiff complained that the minutes distributed throughout the Department were not the ones she had drafted. *See id.* at ¶ 8, Ex. 2. Plaintiff expressed her further

concern that the minutes did not reflect the discussion that had taken place at the WIC's first meeting. *See id.* The WIC held its last meeting in August 1995, while then-Major Baixauli was still Chairperson. *See* Baixauli Decl., at Ex. 3. Sometime thereafter, Plaintiff was appointed the WIC's Chairperson. *See* Mandeville Dep., at 286.

In January 1996, when Plaintiff was serving as a Lieutenant in the Patrol Division, then-Major Baixauli became her immediate supervisor. *See* Mandeville Aff., at ¶ 12. As Commander of the FTP, Plaintiff submitted two reports to Major Baixauli concerning the FTP's progress in achieving its goals and objectives. *See id.* In her first memorandum, dated February 25, 1997, Plaintiff simply stated that "[t]he goals for the Field Training Program are coming along nicely." *See* Baixauli Decl., at ¶ 12, Ex. 4. Major Baixauli returned the memorandum to Plaintiff, with the following admonition and further instruction: "This is unacceptable. Submit a more detailed memorandum listing goals met or not met." *Id.* Plaintiff responded to Major Baixauli's request with another memorandum on February 26, 1997. In her second report, Plaintiff included some sarcastic remarks regarding certain of the FTP's goals and objectives. For example, regarding the goal of ensuring and maintaining the integrity of the Department and meeting its ever-changing needs through the on-going improvement and maintenance of the FTP, Plaintiff responded, "In as far as the FTP is concerned, this subjective goal has not yet been met due to the possible negligent retention of certain officers by higher authorities than this writer." *Id.* at Ex. 5. Regarding the objective of maintaining and allocating four active Field Training Officers per patrol shift, Plaintiff reported that "[t]his objective has not been met because it is a pipe dream." *Id.* Finally, regarding the objective of conducting at least one meeting with all Field Training Officers and Sergeants every four months in the proximity of scheduled shift changes, Plaintiff answered, "This objective has not been met due to the cheapskates who ultimately control overtime pay and compensatory time." *Id.* Given the nature of Plaintiff's second memorandum, Major Baixauli initiated an IA complaint against Plaintiff, containing one count of insubordination and one count of breach of duty. *See id.* at ¶ 11. Following a two-month investigation into Major Baixauli's charges (I.A.97–09), on or about April 16, 1997, Police Chief James Harley (who had replaced Chief Butler upon his retirement in March 1997) sustained the two counts, and issued Plaintiff a written reprimand. *See id.* On or about April 21, 1997, Plaintiff was removed from her position as Commander of the FTP. *See id.* at ¶ 12. Lieutenant Kevin Condon, a male who already had one special assignment as Commander of the Crisis Management Team (Negotiations), replaced Plaintiff as Commander of the FTP. *See id.* at ¶ 13.

In March 1997, Sergeant Paul Miyares filed an IA complaint against Plaintiff, alleging that she had inappropriately ordered him to work despite the fact that he was sick. *See* Mandeville Aff., at ¶ 14. As a result of Plaintiff's orders, Sergeant Miyares had to be hospitalized for dehydration and exhaustion. *See* Decl. of Katherine Sours, at ¶ 4, Ex. 2. In her sworn statement taken for purposes of the IA investigation (I.A.97–13), Plaintiff admitted that she told Sergeant Miyares to come to work. *See id.* Plaintiff alleges that she ordered Sergeant Miyares to report to duty notwithstanding his illness because Major Baixauli previously had instructed Plaintiff not to allow staffing levels on the midnight shift to reach the minimum level. *See id.* On June 12, 1997, Chief Harley sustained Sergeant Miyares' IA complaint, and suspended Plaintiff for ten days. *See id.* On August 7, 1997, David Brown, As-

sistant City Manager, upheld the imposition of Plaintiff's ten-day suspension. *See id.*

In April 1997, Plaintiff applied for a Lieutenant position in the IA unit. *See* Mandeville Aff., at ¶ 16. The position required that the person selected have the following minimum qualifications: (1) investigative experience, (2) no sustained IA investigations for the preceding two years and no pending IA investigations likely to be sustained, and (3) credibility and integrity. *See* Sours Decl., at ¶ 7. On April 21, 1997, Chief Harley promoted Sergeant Dennis Colbert to Lieutenant and selected him for the position in the IA unit. *See id.,* at ¶ 8. Lieutenant Colbert had five and one-half years of investigative experience as a detective with the Department, and had no recent IA complaints. *See id.*

In September 1997, Defendant Baixauli filed another IA complaint against Plaintiff for the procedure she advised certain officers to follow in transporting a female arrestee. *See* Baixauli Decl., at ¶ 14. Plaintiff allegedly ordered the officers to transport the arrestee without conducting a search, allegedly advising them that she would search the prisoner upon their arrival to the police station. *See id.* Defendant Baixauli believed that Plaintiff had violated Department arrest procedures, which state that "[a]ll prisoners will be searched by an officer of the same sex prior to being placed in the transport vehicle, if possible." *See id.* at Ex. 7. Plaintiff emphasizes the "if possible" portion of the procedure, arguing that the male officers could and should have conducted the pat-down search, given the unavailability of a female officer. *See* Mandeville Aff., at ¶ 18; *see also* Decl. of Linda Miller, at ¶ 4 ("[T]he procedure specifically authorizes a pat-down by officers of the opposite sex to the subject being taken into custody.").

Also in September 1997, Plaintiff was on the scene when a riot broke out at the University of Miami Rathskeller. *See* Mandeville Aff., at ¶ 20. Plaintiff called and reported the incident to Police Chief Skinner, who had replaced Chief Harley. *See id.* Plaintiff alleges that Chief Skinner instructed her to call him back in the morning, offering no additional advice on how to handle the situation. *See id.* Plaintiff allegedly called other officers to the scene in order to prevent the incident from escalating, and the incident eventually subsided. *See id.* However, Chief Skinner later criticized Plaintiff's performance in handling and reporting the incident, and put her on emergency suspension on September 29, 1997. *See* Baixauli Decl., at 15, Ex. 8. In January 1998, Chief Skinner demoted Plaintiff from Lieutenant to Sergeant. *See id.*

On or about October 8, 1997, Plaintiff satisfied the conditions precedent to bringing this lawsuit by filing a charge of discrimination with the Florida Commission on Human Relations ("FCHR") and the federal Equal Employment Opportunity Commission ("EEOC"). *See* Compl., at ¶ 7, Ex. 1. In her charge, Plaintiff alleged that she had been discriminated against on the basis of her sex and had been retaliated against for protesting an unlawful employment action. *See id.* On or about December 31, 1997, the FCHR issued Plaintiff a letter notifying her that they were forwarding her charge of discrimination to the EEOC for processing. *See id.* at ¶ 8. The EEOC sent Plaintiff a Dismissal and Notice of Rights letter on May 20, 1998, authorizing her to institute a federal civil rights action. *See id.* at ¶ 9, Ex. 2. Plaintiff properly filed the above-styled lawsuit within ninety days of receiving the EEOC's letter. *See id.* at ¶ 10.

In her August 18, 1998 Complaint, Plaintiff brought suit against City and Deputy Chief Baixauli, in her individual and official capacities. In Counts I and II, Plaintiff alleges that Defendant City treated her disparately based on her gender—in viola-

tion of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760.10(1)—by removing her as Commander of the FTP, denying her promotion to Commander of the IA unit, and demoting her to Sergeant, all while treating similarly situated male employees differently. *See* Compl., at ¶¶ 27–41. In Counts III and IV, Plaintiff claims that Defendant City violated the same statutes when it retaliated against her for testifying in the *Paris* lawsuit and filing a charge of discrimination, in the form of increased hostility and complaints, removal as Commander of the FTP, denial of a promotion to Commander of the IA unit, and demotion to Sergeant. *See id.* at ¶¶ 42–54. Finally, in Count V, Plaintiff alleges that Defendants City and Baixauli retaliated against her for exercising her First Amendment right to free speech, in violation .of 42 U.S.C. § 1983. *See id.* at ¶¶ 55–59. Plaintiff seeks restitutionary and compensatory damages including, but not limited to, damages for mental pain and suffering, anguish, injury of reputation and loss of capacity to enjoy life, back pay, and front pay. In addition, she seeks costs, including attorneys' and expert fees, and any other equitable relief deemed appropriate by this Court.

## II. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (West 1998); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir.1993). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the nonmoving party, then the Court should refuse to grant summary judgment. *See id.* at 919. However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the evidence is merely colorable or is not significantly probative, summary judgment is proper. *See id.* at 249–50, 106 S.Ct. 2505.

## III. Analysis

A. *Sex Discrimination by Defendant City in Violation of Title VII and FCHR*

In Counts I and II of the Complaint, Plaintiff alleges. that Defendant City discriminated against her on the basis of sex, in violation of Title VII and the FCRA.[1] Specifically, Plaintiff alleges that she was treated disparately from similarly situated males when she was removed as Commander of the FTP, denied a promotion to Commander of the IA unit, and demoted to Sergeant. In addition, Plaintiff alleges that the Department discriminated against her due to her involvement with the WIC. Defendant City disputes the allegations that it discriminated against Plaintiff on the basis of sex in any of these matters. Defendant City also contests Plaintiff's ability to bring her sex discrimination claim to this Court, in light of the retaliation-focused allegations of the charge of

---

**1.** Florida courts have held.that decisions construing Title VII are applicable when considering claims under the FCRA. *See Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998). No Florida court has found the FCRA to impose substantive liability where Title VII does not. *See id.*

discrimination she filed with the EEOC and the FCHR. The Court will consider the arguments of Plaintiff and Defendant City in turn, in the following order: (1) Defendant City's argument that Plaintiff's sex discrimination lawsuit is beyond the scope of her charge, (2) Plaintiff's allegation of sex discrimination based on her involvement with the WIC, and (3) Plaintiff's allegations of disparate treatment for certain adverse employment actions taken against her.

### 1. *Presence of Allegation of Sex Discrimination in Plaintiff's Charge*

■ The scope of any Title VII lawsuit is limited to the allegations raised in or those that "can be reasonably expected to grow out of" the charge of discrimination filed by the plaintiff with the EEOC. *See Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir.1988). In other words, "[a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992).

Defendant City alleges that Plaintiff's sex discrimination claims should be dismissed because the statement of facts accompanying her charge alleges only acts of retaliation. *See* Def. City's Mem., at 13. Plaintiff contests Defendant City's reading of the charge, arguing that Plaintiff indeed did allege therein that she was discriminated against because of her sex. *See* Pl.'s Mem., at 12–13.

■ Plaintiff indicated two causes of discrimination on her charge of discrimination filed with the EEOC and the FCHR: sex and retaliation. *See* Compl., at Ex. 1 ("I believe I have been discriminated against [on] account of my sex in violation of the Florida Civil Rights Act of 1992 as well as retaliated against for my previous testimony regarding sexual advances from

the Chief."). Any EEOC investigation into Plaintiff's case therefore would have extended to her sex discrimination claims. As such, the Court finds that Plaintiff's allegation of sex discrimination is within the scope of her charge.

### 2. *Plaintiff's Alleged Discrimination Based on Her Involvement with the WIC*

■ Plaintiff alleges that Defendant City discriminated against her on the basis of sex for her vocal support for and active participation in the WIC. *See* Pl.'s Mem., at 13–14. Plaintiff provides two concrete factual examples to demonstrate discrimination suffered by her and, more generally, "the disdain the Department had for women's issues." *See id.* at 14. First, she notes that someone scrawled "BULL!" onto Chief Butler's February 27, 1995 memorandum announcing the organizational meeting of the WIC. *See* Mandeville Aff., at Ex. 1. Second, she points to her May 2, 1995 memorandum to Defendant Baixauli, in which she expressed her concern that the minutes of the first WIC meeting had been sanitized and did not reflect the complete discussion that had taken place. Plaintiff argues that these instances sufficiently evidence Defendant City's contempt for women's issues, which she suggests may be considered probative of a discriminatory attitude against women. *See* Pl.'s Mem., at 14, *citing Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1343 n. 5 (9th Cir.1981) ("A disdain for women's issues, and a diminished opinion of those who concentrate on those issues, is evidence of a discriminatory attitude towards women.").

Defendant City rebuts Plaintiff's claim on two fronts. First, Defendant City challenges Plaintiff's involvement in the WIC, stating that no WIC meetings were held after August 1995, even after Plaintiff's appointment as the WIC's Chairperson. *See* Def. City's Mem., at 13. Second, De-

fendant City notes that Chief Butler promoted Plaintiff from Sergeant to Lieutenant *after* the creation of the WIC. *See id.* Defendant City states further that the fact that other members of the WIC were promoted subsequent to their involvement contravenes Plaintiff's negative characterization of the Department's attitude towards the WIC or women's issues generally. *See id.*

The instances relied on by Plaintiff in support of her claim, looked at separately or combined, are not at all significantly probative of Plaintiff's position. The fact that someone, presumably a Department employee, wrote the word "BULL!" on the February 27, 1995 memorandum does not mean that Defendant City had or endorsed any disdain for women's issues; at best, it indicates that some individual *may* have harbored such a discriminatory attitude. Plaintiff's reliance on her memorandum to Defendant Baixauli regarding the minutes of the WIC meeting also is misguided. Plaintiff's memorandum presents *her* view that the Department was disdainful of women's issues; it cannot and does not provide probative evidence that the Department indeed was disdainful of women's issues. Even viewing the evidence in the light most favorable to her, no reasonable jury could return a verdict in favor of Plaintiff with respect to this component of her sexual discrimination claim. As such, summary judgment in favor of Defendant City is proper.

### 3. *Plaintiff's Alleged Disparate Treatment due to Adverse Employment Actions*

In order to establish a *prima facie* case for violation of Title VII's prohibition against disparate treatment, Plaintiff must establish that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) her employer treated similarly situated male employees more favorably, and (4) she was

qualified to do the job. *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999). The *Maniccia* Court advised that "[i]n determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* Summary judgment is appropriate where a plaintiff is unable to show the existence of a similarly situated male employee that was treated more favorably by the employer. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997).

■ Plaintiff alleges that the Department treated her differently from similarly situated male employees by removing her as Commander of the FTP, denying her promotion to Commander of the IA unit, and demoting her to Sergeant. Defendant City concedes that Plaintiff is a member of a class protected under Title VII, and that all three of the aforementioned actions qualify as adverse employment actions. However, with respect to each employment decision, Defendant City contends that the relevant male employee was not similarly situated and/or that Plaintiff was not qualified for the position.

### a. Plaintiff's removal as Commander of the FTP

Deputy Chief Baixauli describes the responsibilities of Commander of the FTP to include conducting meetings with officers, reviewing the work performance of officers and trainees, scheduling officers and trainees, interviewing and selecting candidates for trainer positions, managing the use of overtime, and filing complete and accurate reports in a timely manner. *See* Baixauli Decl., at ¶ 7. Defendant Baixauli submits that Plaintiff was unable successfully to fulfill many of these responsibilities. *See id.* at ¶ 8. For example, presumably due to her discomfort with reviewing the work of

her co-employees, Plaintiff stated that her signature on Probationary Police Officer Monthly Evaluation Forms was intended only to indicate her receipt thereof, rather than her concurrence with the evaluations. *See id.* at ¶ 10, Ex. 3. Defendant City also provides various memoranda that evidence Plaintiff's difficulty with scheduling the FTP's officers and trainees. *See id.* at ¶ 8, Ex. 2. Finally, Defendant City contends that Plaintiff's memorandum reporting on the FTP's progress in meeting its goals and objectives was insufficient, insubordinate, and in breach of her duty. *See id.* at ¶ 11, Ex. 4, 5. In apparent contrast to Plaintiff, Lieutenant Kevin Condon had demonstrated himself able to fulfill similar responsibilities in his position as Commander of the Crisis Management Team.

Plaintiff fails to contest any of Defendant City's evidence regarding her inability successfully to meet the demands of the position of Commander of the FTP. Furthermore, Plaintiff does not argue with Defendant City's statement that Lieutenant Condon was senior to Plaintiff or successful in his position as Commander of the Crisis Management Team. Instead, Plaintiff rests this part of her disparate treatment claim on one statement: "With respect to the Field Training Program, she was removed from her role as Commander and replaced with a man, Lieutenant Condon." Pl.'s Mem., at 15.

Plaintiff has not met her burden of establishing that a genuine issue of material fact exists as to whether she was discriminated against on the basis of sex in violation of Title VII with respect to her removal. By failing to counter Defendant's evidence of Plaintiff's lack of qualifications or Lieutenant Condon's qualifications, Plaintiff effectively has conceded that she is unable to make out a *prima facie* case for violation of Title VII on this allegation. As such, the Court finds that summary judgment in favor of Defendant is proper.

### b. Plaintiff's denial of promotion to Commander of the IA unit

Katharine Sours, Major in the Professional Standards Division of the Department and custodian of IA investigation records, describes the minimum qualifications for the position of Lieutenant in the IA Division as investigative experience, no sustained IA investigations for the preceding two years and no pending IA investigations likely to be sustained, and credibility and integrity. *See* Sours Decl., at ¶ 7. When Plaintiff applied for the position, she was the subject of two IA investigations, I.A. 97–09 and I.A. 97–13. *See id.* Defendant City therefore argues that Plaintiff was denied the promotion because she did not meet one of the requisite qualifications, not because of her sex. In contrast to Plaintiff, Lieutenant Dennis Colbert had no recently-sustained IA investigations. *See id.* at ¶ 8.

Plaintiff does not dispute Major Sours' characterization of the minimum qualifications for the position of IA Lieutenant. Plaintiff certainly cannot deny that she was subject to two IA investigations, given that the commencement of those proceedings constitute part of her retaliatory discrimination claims. Plaintiff also does not contest Defendant City's description of Lieutenant Colbert's qualifications. Once again, Plaintiff's argument is brief: "With respect to the Internal Affairs position, she was denied the job and a less senior male, Lt. Dennis Colbert, was selected." Pl.'s Mem., at 15.

Plaintiff has not met her burden of establishing that a genuine issue of material fact exists as to whether she was discriminated against in violation of Title VII on the basis of sex with respect to her denial of the promotion. Plaintiff has presented no evidence that would counter Defendant City's position that Plaintiff lacked a requisite qualification for the position of IA Lieutenant or its record that Lieutenant Colbert had that qualification. Plaintiff effectively has conceded that she is unable to make out a *prima facie* case for violation of Title VII on this allegation. As such, the Court finds that summary judgment in favor of Defendant is proper.

#### c. Plaintiff's demotion to Sergeant

Defendant City argues that Plaintiff's demotion resulted from the accumulation of IA complaints against her, compounded by Chief Skinner's observations of her performance in handling the Rathskeller incident. *See* Def. City's Mem., at 9–10. By the time of her demotion, Plaintiff had the following IA investigations against her either completed or pending: (1) for her memorandum improperly reporting on the FTP's progress in meeting its goals and objectives (I.A.97–09), (2) for inappropriately ordering Sergeant Miyares to work despite the fact that he was sick (I.A.97–13), and (3) for inappropriately advising two male officers to transport a female arrestee without first conducting a patdown search of her person (I.A.97–50). Perhaps more important, after outlining specific problems with Plaintiff's handling and reporting of the Rathskeller incident, Chief Skinner concluded a memorandum as to Plaintiff's job performance as follows: "Lt. Mandeville's overall actions in this incident left many gaps in her performance and demonstrated poor judgment in supervising and approving the completion of reports that did not reasonably address all details of what occurred." Baixauli Decl., at ¶ 15, Ex. 8. David Brown, Assistant City Manager, upheld Chief Skinner's decision to demote Plaintiff. Defendant City reasons that all of these inadequacies in Plaintiff's performance made her no longer qualified to hold the position of Lieutenant; accordingly, Defendant City argues she was not demoted to Sergeant on the basis of her sex.

Plaintiff offers no argument whatsoever in support of her sex discrimination claim with respect to her demotion to Sergeant. Since Plaintiff has provided no evidence in support of her contention that her demotion violated Title VII's prohibition on sex discrimination, she has not met her burden of establishing that a genuine dispute of material fact exists with respect to this issue. Summary judgment in favor of Defendant therefore is appropriate.

The Court concludes that Defendant is entitled to summary judgment on Counts I and II of the Complaint, representing Plaintiff's claims of discrimination on the basis of sex in violation of Title VII and the FCRA.

### B. Retaliatory Discrimination by Defendant City in Violation of Title VII and FCHR

Title VII makes it an unlawful employment practice for an employer to retaliate against an employee either "because [s]he made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]" or "because [s]he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a) (West 1998). In order to establish a *prima facie* case for violation of Title VII's prohibition against retaliation, a plaintiff must establish that (1) she was engaged in a statutorily-protected activity, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally related to the plaintiff's protected activity. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir.1997). Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to rebut the presumption of retaliation by producing a legitimate, non-retaliatory reason for its employment decision. *See Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir.1997). If the defendant proffers a legitimate, non-retaliatory reason for its employment decision, then the presumption of retaliation is rebutted, and the burden shifts back to the plaintiff to show that the employer's proffered reason is pretextual. *See id.*

#### 1. Retaliation Against Plaintiff for Testifying in Paris Lawsuit

In Counts III and IV of the Complaint, Plaintiff alleges that Defendant

City retaliated against her for testifying in the *Paris* lawsuit in the form of increased hostility and complaints, removal as Commander of the FTP, and denial of a promotion to Lieutenant of the IA unit. *See* Compl., at ¶ 43. Although the Court regrets that Plaintiff feels she suffered increased hostility and complaints subsequent to her testimony in the *Paris* lawsuit, Title VII only protects individuals from retaliation in the form of concrete adverse employment actions. As such, the Court only will consider Plaintiff's allegations that she was retaliated against by being removed as Commander of the FTP and being denied a promotion to Lieutenant of the IA unit.

a. Plaintiff's removal as Commander of the FTP

Plaintiff testified in the *Paris* lawsuit in December 1994 or January 1995, and was removed from her position as Commander of the FTP effective April 21, 1997. The passage of more than two years between Plaintiff's testimony and her removal attenuates the line of causation between the two incidents considerably. *See Maniccia,* 171 F.3d at 1369 (holding that fifteen months and twenty-one months between the protected activity and the adverse actions were too long to demonstrate causation). Furthermore, several notable events occurred in that two-year period, further weakening the causal connection. First, Plaintiff was promoted by Chief Butler to Lieutenant in September 1995, eight months *after* she testified against him in the *Paris* lawsuit. *See* Def. City's Mem., at 4. This fact is significant because Plaintiff would not have become Commander of the FTP had she not been promoted to the position of Lieutenant. Second, Plaintiff served as Commander of the FTP for one and one-half years, during which time Defendant City has presented a great deal of evidence that demonstrates Plaintiff was unable successfully to dis-

charge her duties. *See id.* at 6–7. Third, the February 26, 1997 memorandum, taken in the context of Plaintiff's inability adequately to perform, gives Defendant City a legitimate, non-retaliatory reason for removing Plaintiff as Commander of the FTP. *See id.* Plaintiff has provided no evidence to demonstrate that Defendant City's reason was pretextual. Finally, the Court notes that Plaintiff's IA complaint stemming from her February 26, 1997 memorandum was sustained by Chief Harley, not Chief Butler or Major Baixauli. For all of the aforementioned reasons, the Court concludes that Plaintiff has not demonstrated that she can establish a *prima facie* case for retaliatory discrimination based on her removal as Commander of the FTP.

b. Plaintiff's denial of promotion to Lieutenant of the IA unit

Plaintiff was denied a promotion to Lieutenant of the IA unit also in April 1997, two years after she testified in the *Paris* lawsuit. Again, the Court notes that Plaintiff's retaliatory discrimination claim for the denial rests on shaky ground, given the passage of time between the two incidents. Moreover, Defendant City once again has offered a legitimate, non-retaliatory reason for the adverse employment action that Plaintiff did not satisfy the minimum qualifications due to the number pending IA investigations against her. *See id.* at 8. Plaintiff argues that using prior disciplines to subject her to another adverse employment action renders Defendant City's action unfair. *See* Pl.'s Mem., at 10. The Court disagrees with Plaintiff. Plaintiff applied for a position in Internal Affairs; it is imminently reasonable to require prospective employees for such a confidential and quasi-judicial division not to be subject to pending IA investigations. Furthermore, the Court does not sit to second-guess the employment qualifications deemed necessary by the Depart-

ment. Since Plaintiff has failed to offer any concrete evidence that Defendant City's proffered legitimate, non-retaliatory reason is pretextual, the Court will grant summary judgment in Defendant City's favor on Plaintiff's retaliatory discrimination claim for her denial of promotion to Lieutenant of the IA unit.

### 2. Retaliation Against Plaintiff for Filing Charge of Discrimination

■ In Counts III and IV of the Complaint, Plaintiff also alleges that Defendant City retaliated against her by demoting her to Sergeant after she filed her charge of discrimination on October 8, 1997. *See* Compl., at ¶ 44. Chief Skinner demoted Plaintiff to Sergeant on January 20, 1998, following a third IA investigation and his observance of Plaintiff's performance in handling and reporting the Rathskeller incident.

In its role as the forum in which individuals who have suffered discrimination may receive justice, this Court takes very seriously any allegations that an individual suffered adverse employment action by filing a charge of discrimination. However, given the facts of this case, the Court does not find that Plaintiff has provided sufficient evidence on which a reasonable jury could find that Defendant City retaliated against her by demoting her to Sergeant. Plaintiff has provided no evidence that any of the legitimate reasons proffered by Defendant City are pretextual; at best, Plaintiff merely has shown that the adverse employment actions suffered by her came within reasonable temporal proximity to her filing of the charge. Because the Court finds that this evidence is not significantly probative, summary judgment in favor of Defendant City is proper.

The Court concludes that Defendant is entitled to summary judgment on Counts III and IV of the Complaint, representing Plaintiff's claims of retaliatory discrimination in violation of Title VII and the FCRA.

### C. Retaliation for Exercise of First Amendment Rights by Defendant City and Defendant Baixauli in Violation of Section 1983

In Count V of the Complaint, Plaintiff alleges that the City and Deputy Chief Baixauli, in her official and individual capacities, retaliated against Plaintiff for exercising her First Amendment right to free speech, in violation of 42 U.S.C. § 1983. Plaintiff alleges that Defendants removed her as Commander of the FTP, denied her a promotion to Lieutenant of the IA unit, demoted her to Sergeant, and suspended her for ten days, all in response to her exercise of a constitutional right. The Parties disagree significantly over the threshold question of which speech Plaintiff is alleging that Defendant retaliated against her for making. The Court first will address this matter, and then will proceed with an analysis of whether each Defendant violated Plaintiff's First Amendment rights.

### 1. Speech For Which Defendants Allegedly Retaliated Against Plaintiff

Defendants disagree with Plaintiff as to which speech Plaintiff is claiming caused Defendant City to retaliate against her. Defendant City operates on the assumption that Plaintiff is claiming that it retaliated against her for the memorandum she wrote to Major Baixauli regarding the FTP's progress towards meeting its goals and objectives. *See* Def. City's Mem., at 16. Defendant Baixauli similarly believes Plaintiff's February 26, 1997 memorandum to be the speech at issue for purposes of Plaintiff's Section 1983 claim. *See* Def. Baixauli's Mem., at 3. Plaintiff argues that both Defendants misconstrue the underlying subject of Plaintiff's claim; Plaintiff states that the speech at issue is Plaintiff's May 2, 1995 memorandum to Major Baixauli regarding the distribution of a sanitized version of the minutes of the WIC's first meeting. *See* Pl.'s Mem., at 16.

Plaintiff's deposition testimony makes clear that Defendants' position is correct. The following exchange took place during Plaintiff's deposition:

Q. Are you aware that the complaint that your attorneys filed in this case also includes a claim that you have been retaliated as a result of First Amendment speech?

A. Yes.

Q. What was the speech that you claim should receive First Amendment protection?

A. Memorandum that I wrote with reference to the FTO program.

Q. What memorandum was that?

A. There was a memorandum that I wrote addressing the goals, of the progress of the goals.

Mandeville Dep., at 232–33. In further confirmation of Defendants' view is the following exchange:

Q. Were there any other statements or any other form of speech by you other than this memorandum that you think caused Chief Baixauli to take any employment action against you?

A. In this regard, no. But she made numerous complaints and I couldn't do anything right to please her in any way, shape or form.

Q. My question to you is, was there any other speech on your part that you think motivated her to take those actions against you?

A. In this regard I don't know without looking at the file. I believe those were the two that got her upset.

*Id.* at 234–35. It is the Court's position that Plaintiff clearly brings her Section 1983 claim for Defendants' alleged retaliation in response to her February 26, 1997 memorandum.

With respect to the above testimony, Plaintiff urges the Court to find that the deponent's uncertainty in the final answer mandates a conclusion that the speech at issue is Plaintiff's involvement in the WIC. Plaintiff argues that since Count V of the Complaint incorporates by reference all the factual circumstances laid out in Part I of this Order, Plaintiff's WIC involvement necessarily becomes the speech at issue. Reading Count V in this broad manner would produce absurd results, given that the factual allegations incorporated consist of many other examples of Plaintiff's exercise of First Amendment rights, such as her testimony in the *Paris* lawsuit and her application for Commander of the IA unit. Given the Complaint's ambiguity, Defendants specifically deposed Plaintiff as to exactly what First Amendment speech she believed Defendant had retaliated against her for making. Since Plaintiff clearly cites to the FTP memorandum as the speech at issue, the Court will undertake its Section 1983 analysis with respect only to that speech.

### 2. Defendant City's Violation of Plaintiff's First Amendment Rights

 The Eleventh Circuit has developed a four-step test to determine whether a governmental employer has taken action in violation of the First Amendment rights of an employee. *See Vista Community Servs. v. Dean,* 107 F.3d 840, 844–45 (11th Cir.1997). First, the court examines whether the employee engaged in speech that may be "fairly characterized as speech on a matter of public concern." *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989). If the speech does address a matter of public concern, the court considers whether the employee's First Amendment interests are outweighed by the governmental employer's interest in "promoting the efficiency of the public services it performs through its employees." *Id.* If the employee prevails on the balancing test, the court determines whether the employee's speech played a

"substantial part" in the governmental employer's challenged employment decision. *See id.* Finally, if the employee shows that the speech was a substantial motivating factor in the state's employment decision, the state must prove by a preponderance of the evidence that it would have made the same employment decision in the absence of the protected speech. *See id.* at 1566.

#### a. Speech as matter of public concern

In order to decide whether a statement involves a matter of public concern, the court must analyze the content, form, and context of the speech in order to determine its purpose. *See Rankin v. McPherson,* 483 U.S. 378, 384–85, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Johnson v. Clifton,* 74 F.3d 1087, 1092 (11th Cir.1996). If the speech is only of purely personal concern, it is not protected by the First Amendment. *See Badia v. City of Miami,* 133 F.3d 1443, 1445 (11th Cir. 1998). Absent extraordinary circumstances, the protections of the First Amendment are not available to a public employee who is "speak[ing] not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The determination of whether a given speech is a matter of public concern is a question of law to be determined by the court. *See id.* at 148 n. 7, 103 S.Ct. 1684.

In her February 26, 1997 memorandum to Major Baixauli, Plaintiff expresses her frustration with the operation of the FTP, calling one of its objectives "a pipe dream" and those in charge of overtime pay and compensatory time "cheapskates." While the bureaucratic inadequacies of an arm of municipal government may indeed be content worthy of public interest, Plaintiff's personal misgivings—especially in the sarcastic form in which they were expressed—clearly are not. The context of the speech was a memorandum addressed only to Major Baixauli, which means it likely would not even be presented to other members of the FTP or the Department, let alone the interested public. Indeed Plaintiff admits that she had no intention for anyone aside from Major Baixauli to read her report. *See* Mandeville Dep., at 232–38. The Court finds that the content, form, and context of Plaintiff's speech demonstrate that she was expressing her personal grievances, rather than matters of public concern.

Because Defendant City has prevailed on the first part of the *Bryson* test, the Court need not analyze how it would fare against Plaintiff with respect to the other three parts. As such, summary judgment in favor of Defendant City as to Count V is proper. However, the Court nevertheless will analyze the remaining three parts of the *Bryson* test and offer its view on the Parties' respective positions.

#### b. Balance of Plaintiff's First Amendment interests with interests of Defendant as government employer

When acting as an employer, the government has wide discretion and control over the management of its personnel and its internal affairs. *See Williams v. Alabama State Univ.,* 102 F.3d 1179, 1184 (11th Cir.1997). In analyzing a government employer's use of this discretion to take action against an employee for her exercise of free speech, the court must consider the time, place, and manner of the employee's speech, as well as its context. *See Rankin,* 483 U.S. at 388, 107 S.Ct. 2891.

Plaintiff's First Amendment interests clearly are weighty, as are those of all United States citizens. In this case, however, Defendant City's interest in "promoting the efficiency of the public services it

performs through its employees" necessarily outweighed Plaintiff's free speech rights. The brevity and sarcasm with which Plaintiff discussed the FTP's progress on achieving its goals and objectives could severely compromise not only the program's success, but also its continued viability. Had Plaintiff criticized the FTP in a constructive manner, the Court would have a very difficult time concluding that Plaintiff's First Amendment interests were outweighed. Plaintiff, however, chastised her superiors and ridiculed her employer's goals and objectives. This Court cannot say that Defendant City exceeded the great degree of discretion afforded it by law when it subjected Plaintiff to an IA investigation, gave her a written remand, and/or removed her as Commander of the FTP due to her February 26, 1997 memorandum. Because Plaintiff's speech clearly could have had an adverse impact on the Department's achievement of its business, the Court concludes in this situation that Defendant City's interests as a government employer outweighed Plaintiff's First Amendment interests.

### c. Speech as "substantial part" of Defendant City's decisions

Defendant City argues that there were legitimate business reasons for removing Plaintiff as Commander of the FTP, suspending her for ten days, denying her a promotion to Lieutenant of the IA unit, and demoting her to Sergeant, such that her speech was not a "substantial part" of any of these adverse employment actions. *See* Def. City's Mem., at 18. Since she wrongly characterized the speech at issue, Plaintiff failed to address Defendant City's arguments concerning the February 26, 1997 memorandum.

With respect to two of the adverse employment actions identified by Plaintiff, the Court finds that it is unlikely that Plaintiff's speech was even a significant part of Defendant City's decisions. Plaintiff's ten- day suspension resulted from an IA investigation of Sergeant Miyares' complaint against Plaintiff, not from Plaintiff's speech. Plaintiff's demotion to Sergeant, while perhaps influenced by the speech at issue because it resulted in one of three IA investigations against Plaintiff, was proximately caused by Chief Skinner's evaluation of Plaintiff's handling and reporting of the Rathskeller incident.

 Plaintiff's speech indeed played a significant part in her removal as Commander of the FTP and the subsequent denial of her promotion to Lieutenant of the IA unit; whether it was a *substantial* part in these decisions is less clear. Defendant City has entered into evidence several documents which indicate that Plaintiff was not successfully discharging her responsibilities as Commander of the FTP. However, Plaintiff's memorandum alone led to the IA complaint, which seems to have proximately caused Plaintiff's demotion. And that very complaint, in addition to Sergeant Miyares' complaint, together prevented Plaintiff from meeting the minimum qualifications for the position of IA Lieutenant.

The Court finds that Plaintiff's exercise of her First Amendment rights played a substantial part in Defendant City's decisions to remove her as Commander of the FTP and deny her a promotion to Lieutenant of the IA unit. However, having prevailed in the first part of the *Bryson* test— as well as the second part, assuming this Court erred in finding Plaintiff's speech not a matter of public concern—summary judgment in favor of Defendant City remains appropriate.

### d. Decision in absence of speech

In the last part of the *Bryson* test, the government employer must show that its legitimate reasons for making the adverse employment decision, standing alone, would have induced it to make the same

decision. *See Bryson*, 888 F.2d at 1566, *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–52, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

 Similar to this Court's analysis in Part III.C.2.b above, Defendant City likely would have suspended Plaintiff notwithstanding her speech, in light of her allegedly inappropriate decision to order Sergeant Miyares to work despite being sick. Defendant City also has presented legitimate reasons—including, but not limited to, her handling and reporting of the Rathskeller incident—for why Plaintiff was demoted to Sergeant. Furthermore, Defendant City denied Plaintiff a promotion because of the *number* of IA complaints pending against her, not because of the *subject* of those complaints. Defendant City has sufficiently demonstrated that it would have made these three decisions in the absence of Plaintiff's speech.

Defendant City has not presented sufficient evidence to demonstrate that Plaintiff's shortcomings in discharging her responsibilities, standing alone, would have led to her removal as Commander of the FTP. Given this Court's finding that Plaintiff's speech was not a matter of public concern and that, even if it was, Defendant City's interests outweighed her First Amendment interests, summary judgment in favor Defendant City nevertheless remains proper.

### 3. *Defendant Baixauli's Violation of Plaintiff's First Amendment Rights*

In Count V of the Complaint, Plaintiff sues Defendant Baixauli, in her individual and official capacities, for retaliating against her for exercising her First Amendment rights. The Court will examine Defendant Baixauli's liability in each capacity separately.

#### a. Defendant Baixauli in her individual capacity

 Under well-established federal law, government officials performing discretionary functions are immune from suit if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Vista Community Servs.*, 107 F.3d at 844 (11th Cir.1997). The plaintiff bears the burden of establishing that the government official violated clearly established law of which a reasonable person would have known. *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). Summary judgment is appropriate even where the Court finds that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of plaintiff's conduct under the circumstances. *See Johnson v. City of Fort Lauderdale, Fla.*, 126 F.3d 1372, 1378 (11th Cir.1997). Although decisions regarding qualified immunity are made on a case-by-case basis, federal decisions "tilt strongly in favor of immunity by recognizing that only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights." *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir.1994).

The Court already has determined that Defendant City did not violate Plaintiff's First Amendment rights when it removed her as Commander of the FTP, denied her a promotion to Lieutenant of the IA unit, suspended her for ten days, and demoted her to Sergeant. *See* Part III.C.2. Defendant Baixauli was not directly responsible for three out of four of these adverse employment actions—Plaintiff has presented no evidence that Defendant Baixauli was the decision-making authority regarding promotions and/or had any supervisory role in the IA unit, Chief Harley recommended Plaintiff's ten-day suspension on the basis of the complaint instituted by Sergeant Miyares, and Chief Skinner demoted Plaintiff based primarily on his own

evaluation of her handling and reporting of the Rathskeller incident. As to these three adverse employment actions, the Court finds that Defendant Baixauli did not violate Plaintiff's First Amendment rights.

Plaintiff admits that it was within Defendant Baixauli's authority to initiate the IA complaint for insubordination and breach of duty in light of Plaintiff's February 27, 1997 memorandum. *See* Mandeville Dep., at 82–83. Given the content, form, and context of Plaintiff's speech—a progress report in which she belittles the objectives of the FTP and derides officers in the Department—the Court finds that Defendant Baixauli did not violate Plaintiff's First Amendment rights by filing the IA complaint. Furthermore, the ultimate decision to remove Plaintiff as Commander of the FTP was made by an individual with higher authority than Defendant Baixauli, Chief Harley. For these reasons, the Court finds that Defendant Baixauli did not violate Plaintiff's First Amendment rights with respect to her removal as Commander of the FTP.

Because the Court concludes that Defendant Baixauli did not violate Plaintiff's First Amendment rights with respect to any of the adverse employment actions suffered by her, summary judgment in favor of Defendant Baixauli (in her individual capacity) is proper.

 

 b. Defendant Baixauli in her official capacity

The Supreme Court has held that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, [ ] local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114, *discussingMonell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Since Plaintiff also is suing Defendant City in Count V of the Complaint, she may not also maintain her suit against Defendant Baixauli in her official capacity with respect to the same claim. As such, Defendant Baixauli is entitled to summary judgment with respect to Plaintiff's claim against her in her official capacity.

The Court concludes that both Defendants are entitled to summary judgment on Count V of the Complaint, representing Plaintiff's claim of retaliation for exercise of her First Amendment rights, in violation of Section 1983.

### IV. Conclusion

Accordingly, after a careful review of the record and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Defendant City of Coral Gables' Motion For Summary Judgment be, and the same is hereby, GRANTED. Final judgment is hereby ENTERED in favor of Defendant City of Coral Gables and against Plaintiff Marie Mandeville. It is further

ORDERED and ADJUDGED that Defendant Ana Baixauli's Motion For Summary Judgment be, and the same is hereby, GRANTED. Final judgment is hereby ENTERED in favor of Defendant Ana Baixauli and against Plaintiff Marie Mandeville.