PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
03/26/99
THOMAS  K. KAHN
CLERK

No. 98-4080

_____

D. C. Docket No. 95-0037-CV-DLG

BARRY T. SULLIVAN,

Plaintiff-Appellee,

versus

NATIONAL RAILROAD PASSENGER CORPORATION, a foreign corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 26, 1999)**

Before COX and BARKETT, Circuit Judges, and FAY, Senior Circuit Judge.

BARKETT, Circuit Judge:

National Railroad Passenger Corporation ("Amtrak") appeals a final judgment following a jury verdict in favor of Barry T. Sullivan on his claim of unlawful retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et. seq. ("Title VII"), the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) and the Florida Whistleblower's Protection Act, Fla. Stat. Ann. § 448.102(3) (West 1998).  Amtrak argues that the district court should have granted its motion for judgment as a matter of law or, in the alternative, for a new trial.  We reverse.

**Background**

In 1995, Barry Sullivan sued Amtrak, claiming that he was the victim of sexual harassment and retaliation stemming from an incident in December 1993 when Sullivan's immediate supervisor, Kevin Scott, allegedly sexually propositioned him in a hotel parking garage. Sullivan claims that the incident occurred while the two were traveling on business and staying at a hotel in Tampa, Florida. According to Sullivan, when Sullivan accompanied Scott to the hotel parking garage to retrieve Scott's briefcase from the car, Scott suggested that Sullivan accompany him to Scott's room for a short while, and that Sullivan would not regret it. Sullivan claimed he slammed Scott to the trunk of the car, causing Scott to lose his glasses. As Scott retrieved his glasses from the ground, he apologized profusely to Sullivan, asking him to forget about the incident and assuring him that it would not happen again. According to Sullivan, Scott further assured him that he would have nothing to worry about for as long as the two continued to work together. Sullivan did not report this incident to anyone at Amtrak until February 1994, after he had been demoted from his job as manager.

Sullivan's demotion occurred on January 26, 1994, when Scott hand-delivered a letter to Sullivan informing him that his management job as District Manager of the Miami Station had been eliminated as part of Amtrak's nationwide reorganization. This led to Sullivan's taking the non-managerial position of Yard Chief of the Miami Station. On February 11, 1994, Amtrak began an investigation into the whereabouts of fifteen missing Publix gift certificates as well as a cellular phone that had been in Sullivan's care. Shortly thereafter, Sullivan returned eight of the gift certificates and the phone. He could not account for the missing eight certificates, which were cashed at a grocery store near his home. He also admitted to making, along with his wife,

over one thousand dollars worth of unauthorized calls on the company phone. Amtrak took no formal action against Sullivan regarding either the phone or the gift certificates.

On approximately February 15, 1994, Sullivan's attorney lodged a complaint with Amtrak on Sullivan's behalf, claiming that the incident with Scott in December 1993 constituted sexual harassment. Amtrak officials investigated the complaint and concluded that the incident had not in fact occurred. In June 1994, Sullivan's work schedule was changed from four to five days a week. Amtrak claims that this change was necessary to satisfy a Food and Drug Administration (FDA) regulation that all inbound trains be inspected and cleaned upon arrival. In July 1994, Amtrak eliminated all Yard Chief positions nationwide. Sullivan then took the lesser position of Chief of On Board Service. Throughout 1995, Sullivan unsuccessfully applied for a number of different management positions including: Director of OBS Station Support (January 1995); Product Line Director (March 1995); Manager of Terminal Services, Miami (March 1995); Manager of Terminal Services, New Orleans (May 1995); Conventional Services Manager, Northeast Corridor (April 1995).

Sullivan filed suit against Amtrak in February 1995, claiming that the incident with Scott in December 1994 constituted sexual harassment. Sullivan amended his complaint in June 1995 to include charges that Amtrak had retaliated against him by: 1) investigating his involvement with the misuse of a company cellular telephone and the theft of fifteen Publix gift certificates; 2) changing the job description of Sullivan's job as Yard Chief and then eventually eliminating the position, and; 3) after eliminating the position, failing to hire him for any of the other management positions for which he applied.

The jury found against Sullivan on his claims of sexual harassment and Sullivan has not appealed from the judgment on that claim. However, the jury found for Sullivan on his claims of retaliation, awarding him $50,000 in compensatory damages. Following the trial, the magistrate judge held an evidentiary hearing and awarded Sullivan equitable damages in the amount of $98,783 in backpay, with pre-judgment and post-judgment interest calculated at 6.5%, and front pay in the amount of $458,166.

On appeal, Amtrak argues that the district court erred by not granting Amtrak judgment as a matter of law or, alternatively, a new trial because: 1) the jury found against Sullivan on his sexual harassment claim and therefore could not reasonably find for Sullivan on his retaliation claim; and 2) there was no evidence of retaliation. Amtrak additionally claims that the damage amounts awarded by both the jury and the magistrate judge were not supported by the evidence.

**Discussion**

We first address Amtrak's claim that, as a matter of law, the jury could not find against Sullivan on his sexual harassment claim while finding for him on the retaliation claim.[1] Amtrak argues that Sullivan's harassment claim is based on a single incident which Amtrak maintains never occurred. Because the jury found for Amtrak on the sexual harassment claim, Amtrak asserts, the jury must have accepted Amtrak's contention that the incident never happened. Consequently, Amtrak argues, Sullivan's claim of retaliation cannot stand because it requires a good faith, objectively reasonable belief that the discrimination occurred. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1998).

---

[1] We review the district court's denial of Amtrak's motion for judgment as a matter of law de novo. See Daniel v. City of Tampa, Fla., 38 F.3d 546, 549 (11th Cir.1994).

We find this argument totally meritless. The fact that the jury concluded that Sullivan's claim did not meet all the elements for a successful sexual harassment action does not mean that it could not have found that the incident did take place and that Sullivan could have reasonably believed himself the victim of sexual harassment. For example, the jury could well have determined that the incident occurred but did not rise to the level of harassment prohibited by Title VII. Courts may not reach behind jury verdicts to evaluate their reasoning. See, e.g., U.S. v. Russo, 796 F.2d 1443, 1450 (11th Cir. 1986) (court will not look behind verdict for evidence of jury confusion); Delpit v. Nocuba Shippping Co., 302 F.2d 835, 838 (5th Cir. 1962) ("We may not second-guess jurors or substitute our judgment for theirs when theirs is supported by sufficient evidence."); Vera-Lozano v. International Broadcasting, 50 F.3d 67, 71 (1st Cir. 1995) (court will not supplant the jury verdict nor second-guess what may have been their thought process). Moreover, retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed. Meeks v. Computer Associates Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994); Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989).

Turning to the question of whether there is sufficient evidence to support Sullivan's claim of retaliation, however, we find Amtrak's appeal meritorious. To make a prima facie case for retaliation, the plaintiff must show: 1) a statutorily protected expression; 2) an adverse employment action; 3) a causal link between the protected expression and the adverse action. See Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998); Raney v. Vinson Guard

5

Service, 120 F.3d 1192, 1196 (11th Cir. 1997).[2]  Once the plaintiff makes out a prima facie case, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." Raney, 120 F.3d at 1196 (quoting Hairston v. Gainesville Sun Publishing Co. 9 F.3d 913, 919 (11th Cir. 1993)).  If the defendant offers legitimate reasons, the presumption of retaliation disappears. Id.  The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. Olmsted, 141 F.3d at 1460.

There is no dispute that Sullivan's complaint to Amtrak's management that he had been sexually harassed constituted protected expression nor that Sullivan suffered adverse employment actions.  The only issue to be addressed here is whether a causal link existed between the adverse employment action and the protected expression.

While Sullivan initially included in his complaint as adverse employment actions his first demotion and the investigation into the gift certificates and cellular phone, he concedes that these cannot be considered retaliatory actions because they predate the protected expression.  Thus, the only question before us is whether a causal link exists between Sullivan's sexual harassment complaint and the change in his work hours, the subsequent elimination of his job, and Amtrak's failure to rehire him.

Although Sullivan argues that the change in his work hours as Yard Chief and the subsequent elimination of the position were retaliatory actions taken directly by Scott, he offers no evidence to refute Amtrak's contentions that the change in hours was a response to an FDA

---

[2] The district court instructed the jury to apply this test for both Sullivan's state and federal retaliation claims.  Neither party has disputed that instruction.  Consequently, we follow the same procedure.

6

requirement and that the job's subsequent elimination (along with all other Yard Chief positions) was part of a nationwide restructuring. Absent evidence suggesting that Amtrak's reasons for changing the Yard Chief's hours and then eliminating the position were pretextual, Sullivan's retaliation claim arising from this action must fail.

Sullivan next claims that Amtrak failed to rehire him to a management position for retaliatory reasons. He argues that he was more qualified than the successful applicants for all of the management positions for which he applied, and that in each case he was denied the position by someone who had some tie to Scott or who knew of his sexual harassment complaint. In each case, however, there is insufficient evidence to support a conclusion that Sullivan was not hired for retaliatory reasons.

First, according to Sullivan, he should have received the position of Director of OBS Station Support because the job's responsibilities were similar to those he had been performing for the past twenty years. Sullivan claims that Jon Tainow, who did the hiring for the position, told him that as far as he was concerned, Sullivan had the job but that Ken Bagley, Deputy Chief Executive Officer for the Northeast Corridor and a friend of Scott's, told Tainow to "take a good look" at another candidate, Mark Rose. Rose eventually got the position. Tainow, however, testified that he never told Sullivan that Sullivan had the job and that he hired Mark Rose as Director of Operations because of his administrative background and budget experience. Tainow further stated that the only role Bagley played in the hiring process was that Tainow and Bagley reviewed the list of candidates prior to Tainow's informing Bagley that he was going to hire Mark Rose. More importantly, Tainow testified that he only learned of Sullivan's harassment complaint a week before the trial. Sullivan presented no evidence to rebut the

testimony that the decisionmaker in this case was not aware of his complaint or to show that the reasons Sullivan was not hired were false.

Second, Sullivan claims he should have received the Product Line Director position because it also encompassed duties he had been performing for many years. Moreover, Dennis Hale, the successful candidate, had a marketing background which Sullivan maintains did not prepare him for the on-board services component of the job. Sullivan further claims that the decision about whom to interview was made "in conjunction" with John Stafford, Amtrak's Director of Human Resources, who knew of Sullivan's sexual harassment complaint. However, Allan Edelston, who did the hiring for the position, testified that he hired Dennis Hale for the Product Line Director position because of Hale's experience managing the Autotrain, Amtrak's flagship train. Although Stafford participated in the interview process, the decision was made by Edelston and Edelston testified that the first time he heard of Sullivan's sexual harassment complaint was in the Spring of 1996, over a year after he had filled the position. Again, there is no evidence in the record to rebut the testimony that the decisionmaker did not know of Sullivan's complaint or to show that Amtrak's reasons for hiring Hale were pretextual.

Third, Sullivan claims he should have received the Manager of Terminal Services positions, jobs for which he was not interviewed. Scott Weddle, who was hired for the Miami position, had held a lower position than Sullivan's prior to the reorganization. The New Orleans position went to James Turngren, who had also held a position lower than Sullivan. In each case, Sullivan claims Stafford participated in the hiring process by pointing out what the interviewer should look for when selecting the person for the job. In response, Dennis Hale testified that he hired Scott Weddle for the Miami Service Manager job because of his training

8

background in on-board service and because of his philosophy of integrating employees into the decision-making process, and because Hale considered him the best qualified applicant for the job.[3] He further testified that he only learned of Sullivan's sexual harassment complaint in late 1996. Sullivan presented no evidence to rebut Hale's asserted ignorance of the complaint or to show that the reasons Hale proffered for selecting Weddle over Sullivan were false. And, while Charles Bothwell did not testify directly as to why Turngren got the New Orleans job over Sullivan, he testified in a deposition read at trial that at a General Managers meeting he attended following the reorganization, several people raised questions as to Sullivan's integrity and honesty. Those concerns stemmed from their belief that Sullivan gave false reasons for requesting a transfer to Miami from New York, and from his attempts to get his wife a position in Miami in violation of the company's nepotism policy. John Stafford also testified that at that meeting Scott recommended Sullivan for several open management positions but that questions were raised about Sullivan's performance ratings and about his integrity stemming from his attempt to get his wife hired in Miami.[4]

Finally, Sullivan claims that he, rather than John Coffe, should have gotten the Conventional Service Manager position. He argues that Coffe, who was not an Amtrak

---

[3] There is some discrepancy in the record as to who got this position. Hale testified at trial that the position went to Weddle. However, Stafford, in his deposition, states that the job went to J. MacArthur. In either case, Sullivan presented no evidence to show that the hiring decision was made for retaliatory reasons.

[4] Sullivan testified that he was aware that he had angered a number of people in management following his move to Miami. Margaret Leitereg, Amtrak's Human Resources Manager for the New York district until 1995, also testified that Stafford told her in January 1994, a month prior to Sullivan's lodging a complaint, that Sullivan would not wind up with a management position following the reorganization because he had alienated too many people in the years previous.

9

employee, was selected over him despite Amtrak's policy of hiring and promoting from within, and that Coffe's technical background with commuter railroads did not match Sullivan's qualifications for a position that dealt with food amenities and sleeper cars. According to Sullivan, David Nogar told him after their interview that he was at the head of the list of candidates, but Nogar then checked with some of Sullivan's previous supervisors and removed him from contention for the job. Sullivan also asserts that Nogar "reported to" Bagley and "knew" Scott. He further notes that each of the other district managers who lost their positions during the reorganization were subsequently rehired in management positions. In response, David Nogar testified that he chose Coffe, a man with whom he had worked previously, because of Coffe's customer service sensitivity and mechanical background. He denied checking with any of Sullivan's previous superiors or to knowing any more about his employment history than Sullivan listed on his application. He further stated that he only learned of Sullivan's sexual harassment complaint a week prior to testifying at the trial. Sullivan again failed to rebut Nogar's stated ignorance of the harassment complaint.

When an employer offers legitimate reasons for its actions, as Amtrak did, the presumption of retaliation disappears. The plaintiff then bears the burden of showing that the employer's reasons for not promoting him were pretextual. Sullivan has not borne that burden. He failed to introduce any evidence that would have permitted the jury to legitimately draw the inference that the reasons proffered by Amtrak for Sullivan not getting these jobs were false and that the real reason was retaliation. We recognize that circumstantial evidence can suffice to support inferences that retaliation was the reason for the adverse action. In this case, however, the evidence presented is far too speculative to support the jury's conclusion that Amtrak

10

retaliated against Sullivan by not promoting him to any of the management jobs for which he applied following his demotion.

Accordingly, we **REVERSE** the judgment of the district court and **REMAND** the case for entry of judgment on behalf of Amtrak.[5]

---

[5] Because we reverse on the retaliation claims, we need not address the issue of whether the damage amount was appropriate.