[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 23, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-10905
Non-Argument Calendar

_____

D. C. Docket No. 03-02608-CV-S

KELLI EMBRY,

Plaintiff-Appellant,

versus

CALLAHAN EYE FOUNDATION HOSPITAL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(August 23, 2005)**

Before HULL, WILSON and FAY, Circuit Judges.

PER CURIAM:

Kelli Embry appeals through counsel the district court's grant of summary judgment, pursuant to Fed.R.App.P. 56(c), to her employer, Callahan Eye Foundation Hospital ("Callahan"), a "full service surgical facility," on her claims of disparate treatment based on race, filed pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 1981; and her Title VII claims of retaliation, filed pursuant to 42 U.S.C. § 2000e-3.[1] Embry argues that genuine issues of material fact existed on whether she established a prima facie case of disparate treatment or retaliation, and, if she established prima facie cases of retaliation, on whether Callahan's articulated reasons for its employment decisions were pretextual. For the reasons set forth more fully below, we affirm the court's grant of summary judgment.

Embry, an African-American employee of Callahan, who was hired as a patient-accounting clerk in August 2000, filed a civil complaint, asserting that Callahan (1) discriminated against her because of her race by disciplining her more harshly than similarly situated Caucasian employees; (2) discriminated against her because of her race by subjecting her to other unequal treatment, including (a) not

---

[1] As the district court noted, Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)). Thus, we conclude that Embry could not establish prima facie cases of disparate treatment under § 1981 for the same reasons as are applicable under Title VII, and references in this opinion only will be to Embry's Title VII claims.

providing her with orientation when she first was hired,[2] (b) forcing her to "clock in and out," and (c) denying her privileges given to white employees; and (3) retaliated against her for engaging in the protected activity of opposing these discriminatory employment practices by disciplining her.

Callahan filed a motion for summary judgment on all of Embry's claims, arguing that no genuine issue of material fact existed on Embry's claims of disparate treatment because Embry had (1) not established an "adverse employment action," (2) failed to establish that Callahan treated persons outside of her protected class more favorably, and (3) not produced evidence showing that Callahan's non-discriminatory reasons for her treatment were pretextual.  Callahan argued that it was due summary judgment on Embry's retaliation claims because Embry could not show either that she engaged in protected activity prior to the alleged retaliatory treatment, or that the treatment was based on protected activity. Callahan further contended that, even if Embry could establish a prima facie case of retaliation based on her one-day suspension, she could not show that Callahan's non-retaliatory reason for suspending her was pretextual.

_____

[2]  Apparently based on its assumption that Embry had abandoned her claim that Callahan had discriminated against her by not immediately providing her with orientation, the district court did not address this claim in its decision granting Callahan summary judgment.  Because Embry has not addressed this absence on appeal, we deem any arguments on it abandoned.  See Cooper v. Southern Co., 390 F.3d 695, 734 n.24 (11th Cir. 2004) (concluding that plaintiff abandoned any issues on appeal for which she offered no argument), petition for cert. filed, No. 05-88 (U.S. July 14, 2005).

In support of its motion for summary judgment, Callahan filed a declaration by Keren Elkins, Embry's supervisor at Callahan, in which Elkins attested that (1) Callahan hired Embry as a patient-account representative on September 5, 2000; (2) as one of several patient-account representatives in the business office, Embry was responsible for submitting insurance claims for payment; (3) from Embry's date of hire until February 28, 2001, Mark Teske was the acting supervisor over the business office; and (4) in February 2001, Elkins began her duties as the Director of Patient Accounts, with supervisory responsibility over the business office.

Elkins further attested that (5) in May 2001, Michelle Capps, another patient-account representative in Callahan's business office, had to leave work and go to the hospital because she had an allergic reaction to a coworker's perfume; (6) on August 23, 2001, to address this allergy problem, Callahan distributed a memorandum, implementing a new policy prohibiting the use of fragrances that could cause an employee to have an allergic reaction;[3] (7) in September 2001, this

_____

[3] This memorandum included as follows:

> Due to increase in number of employees, patients, and visitors with moderate to severe allergies, the Dress Code has been updated to include the following requirement: Please refrain from using perfumes, colognes, scented lotions, scented aftershave, and other fragrant products that might send your co-worker into an allergic reaction."

Elkins stated during her deposition that, although this memorandum arguably was limited to

4

policy was placed in the employee newsletter; (8) from September 2001 until April 10, 2002, Callahan attempted to "manage the perfume problem" by conducting informal counseling with individual employees who wore fragrances; (9) on April 10, 2002, Elkins, Libby Bailey, Callahan's Chief Operating Officer, and Karen Burleson, Callahan's Director of Human Resources, conducted a meeting, at which Embry was in attendance; (10) during this meeting, employees in Callahan's business office were warned that they should not wear any scents or fragrances; (11) after this meeting, Elkins, Burleson, and Bailey agreed that, starting that day, any employee who violated this fragrance policy would be suspended for the remainder of the day; and (12) on April 16, 2002, Elkins suspended Embry for violating this fragrance policy.[4]

Elkins stated, as well, that, (13) when Elkins was informed that Michael Morrison, a part-time employee in the business office who was not working at Callahan in the Fall of 2001, when the policy was instituted, had been wearing cologne, Elkins investigated the complaint;[5] (14) during this meeting with

---

fragrances that "could cause an employee to have an allergic reaction," Callahan interpreted the policy as prohibiting the use of all fragrances.

[4] Elkins explained in further detail during her deposition that, after Capps complained about having an allergic reaction to someone's fragrance in the business office on April 16, 2002, Elkins walked through the office and smelled a fragrance only on Embry and her African-American coworker, Cherry King, both of whom were suspended.

[5] Elkins testified during her deposition that Morrison is Caucasian.

5

Morrison, (i) Elkins did not detect cologne on Morrison, and (ii) Morrison denied knowing about the fragrance policy; and (15) since April 10, 2002, Elkins had investigated all allegations relating to the fragrance policy and had not determined that any other employees had violated it. Finally, Elkins attested that, (16) because of repeated abuses of the lunch break by employees, all of the employees in the business office were required to "clock in and out" for lunch; (17) Elkins sent an e-mail to these employees to inform them of this policy change; (18) Elkins was not aware of any times that Capps violated this policy; and (19) Elkins did not know that Embry complained to Burleson about race discrimination in May 2001.

Callahan also introduced a copy of Elkins's deposition, which included, in addition to the above-referenced testimony, that, upon becoming supervisor of the business office, Elkins decided to enforce in the office the hospital-wide policy prohibiting employees from eating at their desks after "clocking in" at work. On January 31, 2002, Elkins saw Embry and another African-American employee, LeAndrenetta Nalls, eating at their desks after they "clocked in" at work, in violation of this policy. After sending them an e-mail reminding them of this policy, Elkins e-mailed Bailey about the violations. Bailey responded by suggesting that Elkins discipline employees for such violations, to which Elkins replied: "I agree . . . boy want [sic] that be fun, I can't wait."

6

Elkins further testified that, on February 6, 2002, after overhearing Embry and other employees in the business office talking during work hours, she informed these employees that they, instead, should be working. Embry responded that "[e]verybody doesn't work eight hours straight." Elkins also subsequently heard Embry continue to talk with coworkers, including stating that Elkins better not say anything more to them about taking breaks. On the following day, Elkins and Bailey met with Embry and gave her a written reprimand for "insubordination."

Callahan also filed a copy of Embry's deposition, in which Embry testified that, after Callahan instituted its policy of requiring employees in the business office to "clock in and out" during their lunch breaks, Embry, along with other African-American coworkers, Nalls, King, and Sanquenetta Williams, complied with this policy, while some of her Caucasian coworkers, including Capps, did not comply with it and used more than the 30 minutes that they were permitted for lunch breaks. Embry stated that, on May 31, 2001, when she and Williams were discussing that this policy was not being equitably enforced, Capps overheard their discussion, and Embry and Capps had a heated argument, during which they had to be physically separated by King and Williams. Elkins subsequently spoke to Embry about this argument, but Elkins did not discipline either Embry or Capps.

Embry further testified that, on May 31, 2001, she met with Burleson and

discussed her altercation with Capps, along with other concerns Embry had about the business office.[6] On February 15, 2002, Embry filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been discriminated against because of her race. On April 16, 2002, Embry refused to sign a discipline report informing her of her one-day suspension because (1) she was wearing the same fragrance that she normally wore, and (2) Capps had not previously had a reaction to the fragrance. Embry further stated that (1) she believed the fragrance policy only involved keeping fragrances to a minimum and was put in place to avoid Capps having an allergic reaction, (2) Embry asked Capps to smell all of her lotions to ensure that they would not bother her, and (3) Embry never wore a lotion that she had not previously tested on Capps.[7]

---

[6] As an exhibit to Embry's deposition, Callahan filed an e-mail memorandum, dated June 5, 2001, in which Embry outlined the complaints she had about the office, and which she shared during her meeting with Burleson on May 31, 2001. This memorandum included that Embry believed that the enforcement of the policy concerning lunch breaks and the distribution of work in the office was not fair and equitable, but did not mention race discrimination. Embry, however, testified during her deposition that, during this meeting, she also complained of disparate treatment based on race.

[7] This written discipline, which was signed by Elkins, included as follows:

Employees have been reminded of the workplace policy concerning perfumes, cologne's and scented lotions on numerous occasions. We have several people in the business office with severe allergies and because of this the employees have been asked to refrain from using any type of scented perfume. Kelli has continually ignored request by management to adhere to policy. Employees were reprimanded in a Department meeting on April 10, 2002, of the importance of this policy. Kelli came in to work today April 16th with some type of cologne or lotion that could be smelled in all areas of the office. For this behavior, Kelli is suspended for one day without pay.

8

Finally, Embry testified that coworkers Williams, King, Nalls, and Morrison had informed her that they had not been disciplined that day, even though they also had been wearing fragrances.

Embry responded that summary judgment was not warranted on her disparate-treatment claim based on her suspension because a genuine issue of material fact existed as to whether a similarly situated white employee in the business office, that is, Morrison, was punished differently for violating Callahan's policy on wearing fragrances. Embry explained that Morrison was a similarly situated employee who was treated differently because Morrison testified during his deposition that (1) he went to an orientation session during the winter of 2002, during which policies and the dress code were discussed; (2) Elkins told Morrison during the winter of 2002, that she knew that he had been wearing perfume and that he needed to stop it; (3) Morrison probably was wearing cologne on the day that he was counseled by Elkins, and he had continued wearing cologne after that date; and (4) Morrison had never been disciplined for this conduct.

Embry also contended that the district court should not grant summary judgment on her retaliation claim based on her suspension because (1) she engaged in protected activity by (i) complaining of race discrimination to Burleson in May

_____

Embry also testified during her deposition that, at the time of her suspension, she was earning $11.83 an hour.

9

2001, and (ii) filing an EEOC charge against Callahan in February 2002; (2) her April 2002, suspension was an adverse employment action; and (3) she could show a causal connection between them based on (i) their close temporal proximity, and (ii) the series of emails between Elkins and Bailey, which reflected Elkin's improper motive in disciplining Embry. In addition, Embry argued that she could show that Callahan's articulated reason for the suspension was pretextual through (1) proof that Morrison and other employees were not disciplined in a similar manner for violating the fragrance policy, and (2) the January 31, 2002, e-mail between Elkins and Bailey, which Embry contended showed that Elkins would take pleasure from disciplining her.

Furthermore, Embry responded that genuine issues of material fact existed as to her claim that she was treated differently than white employees in certain terms and conditions of employment, that is, clocking in and out for lunch and being written up for eating breakfast at her desk, because Callahan did not enforce these policies with respect to Capps, a Caucasian employee. Embry contended that she could prove that her February 2002, reprimand was in retaliation for her complaints of race discrimination to Burleson in June 2001. She also argued that she could show that any reason for this different treatment was pretextual, based on the same evidence she had offered in relation to her suspension claims.

10

Callahan replied that Morrison was not similarly situated to Embry for purposes of Embry's suspension claim because Elkins never caught Morrison wearing cologne after April 10, 2002, when Callahan decided to suspend any employee in violation of the fragrance policy. Callahan also replied that Embry had offered no evidence showing a causal connection between her protected activities and her suspension because (1) her complaint of race discrimination in May 2001 was not close in time to the suspension, and (2) the e-mail between Elkins and Bailey, although arguably unprofessional, did not reflect a discriminatory animus.[8] In addition, Callahan asserted that summary judgment was warranted on Embry's remaining claims because Embry had failed to show that (1) the conduct constituted "adverse employment actions," and (2) Elkins was aware that similarly situated white employees violated the policy involving "clocking in and out" and had not disciplined them.

The district court granted Callahan's motion for summary judgment. In doing so, the court initially explained that it was "doubtful" that any single, or combination of, employment actions of which Embry complained constituted an adverse employment action because the conduct either was not adverse at all, or it

---

[8] In support of this argument, Callahan cited to Elkins's deposition testimony that her comment in this e-mail, that is, "want [sic] that be fun," was intended to be sarcastic because, at the time in question, she was having to spend a lot of energy monitoring employees.

11

did not materially change her employment status. The court also discussed that, even assuming that the conduct was adverse, Embry had failed to establish a <u>prima facie</u> case of disparate treatment based on her suspension or other employment practices because she had failed to identify a similarly situated employee outside of her class who was treated more favorably. The court acknowledged that Embry had identified Morrison as a comparator, but it concluded that Embry had offered no evidence showing that Elkins knew or believed that Morrison was wearing cologne on the days that he was investigated.

The court similarly determined that summary judgment was warranted as to Embry's retaliation claims because, as discussed above, Embry had failed to identify any "adverse employment actions." Moreover, although both Embry's May 2001 complaint to Burleson, and her filing a charge with the EEOC, qualified as protected activity, Embry had failed to show that her February 7, 2002, reprimand was causally related because Elkins denied knowing about the May 2001 complaint. The court also determined that, although Elkins knew that Embry engaged in the protected activity of filing an EEOC charge on February 15, 2002, and this activity was sufficiently close in time to establish a causal connection between this activity and Embry's suspension, Embry had failed to show that Callahan's legitimate, non-discriminatory reason for her suspension was

12

pretextual.[9]

**Issue 1:** **Prima facie case of disparate treatment based on race or retaliation**

Embry argues that she established a prima facie case of disparate treatment based on her April 2002, suspension by (1) identifying Morrison as a proper comparator, and (2) showing that Morrison was not suspended after he violated the fragrance policy. Embry also contends that a genuine issue existed as to her prima facie case of disparate treatment based on Callahan's unequal enforcement of its policies involving employees eating during work and taking lunch breaks because she presented evidence showing that she, as an African-American employee, was held to a higher standard in following these policies than her Caucasian coworkers. Finally, Embry contends that she established prima facie cases of retaliation because her February 2002, reprimand and her April 2002, suspension were "adverse employment actions" that were causally connected to her May 2001, complaint of discrimination and her February 2002, EEOC charge respectively.

A court's order granting summary judgment is reviewed de novo, "view[ing] all evidence and all factual inferences therefrom in the light most favorable to the

_____

[9] In addressing pretext, the court specifically concluded that (1) Elkins did not suspend Morrison because she did not believe he was wearing a fragrance, (2) Embry had failed to rebut Elkins's plausible testimony that the language in the relevant e-mails between her and Bailey was sarcastic, and (3) this e-mail was sent prior to Embry filing an EEOC charge.

13

non-moving party." Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir. 2004). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. at 1259 (quotation omitted). To survive a motion for summary judgment, the nonmoving party must proffer evidence beyond what is asserted in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.E.2d 265 (1986) (citing Fed.R.Civ.P. 56(e)). Where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," no genuine issue of material fact exists. Id. at 322-23, 106 S.Ct. at 2552.

To the extent Embry is arguing that a genuine issue of material fact existed as to her claims of disparate treatment and retaliation, Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Furthermore, it is unlawful under Title VII for an employer to retaliate against an employee "because [the employee] has opposed any practice made an

14

unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII]." 42 U.S.C. § 2000e-3(a).

Where direct evidence of discrimination or retaliation is unavailable—as was the case here—a plaintiff may present circumstantial evidence of discrimination sufficient to create a jury question. Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir. 2001) (Title VII disparate treatment); Sullivan v. National Railroad Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999) (Title VII retaliation). For claims based on circumstantial evidence, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Silvera, 244 F.3d at 1258. If the plaintiff is successful, the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." Id. The plaintiff then may attempt to demonstrate that the proffered reason was, in fact, merely pretext for the defendant's acts. Id.[10] "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of

---

[10] The Supreme Court set out this three-part burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

15

material fact regarding whether each of the defendant's articulated reasons is pretextual, the [defendant] is entitled to summary judgment on the plaintiff's claim." Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc) (discussing pretext in context of discrimination involving age and disability).

### a. Disparate treatment

"A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). The parties, at least implicitly, agree that Embry is a qualified member of a protected class. Moreover, as an employee of Callahan since 2000, Embry presumptively is qualified for the position she occupies. See Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th Cir. 2001) (explaining that "[i]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred" (quotation omitted)). Thus, in determining whether a genuine issue of material fact existed as to Embry's claims of disparate treatment, we only need decide whether Embry suffered an "adverse employment action," and, if so, whether a similarly situated non-protected employee was treated more favorably.

16

Although we have "not adopted a bright-line test for what kind of effect on the plaintiff's 'terms, conditions, or privileges' of employment the alleged discrimination must have for it to be actionable," we have clarified that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001). Indeed, "[a]lthough the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." Id. at 1239. Thus, "an employee must show a serious and material change in the terms, conditions, or privileges of employment." Id. (emphasis in original). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances" Id.

In Davis, the plaintiff's claim of disparate treatment was predicated on two kinds of employer acts, that is, negative job performance memoranda placed in his file and changes in his work assignments. See id. at 1240. We determined that the memoranda, which were not "formal" reprimands, and did not result in the plaintiff suffering any tangible consequences in the form of loss of pay or benefits, were not "adverse employment actions." See id. at 1240-41. In reaching this determination,

17

we explained that "criticisms of an employee's job performance—written or oral—that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit." See id. at 1241. Similarly, we concluded that the removal of the plaintiff's title as an officer did not constitute a demotion or a significant change in work assignments because any change in his responsibilities was not substantial. See id. at 1243-44 (noting that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions" (internal quotations and marks omitted)).

Here, Embry's allegation that Callahan did not equitably enforce its policy requiring employees in the business office to "clock in and out" at lunch did not involve "a serious and material change in the terms, conditions, or privileges of employment." See id. at 1239. Indeed, the only employment act associated with this policy involved Elkins sending a general e-mail to the office reminding them of this policy. On the other hand, Embry's allegation that Callahan did not equitably enforce its policy requiring employees not to eat during work hours involved the fact that Elkins reprimanded her in February 2002, in part because she violated this policy. However, similar to the facts in Davis, Embry failed to cite to evidence showing that this reprimand resulted in her suffering any tangible consequences in the form of loss of pay or benefits, and it, thus, was not an

18

"adverse employment action." See id. at 1240-41.

To the extent Embry also identified her one-day suspension as an "adverse employment action," we recently have explained that, following the language of Title VII, "actions that affect compensation are considered adverse employment actions." See Gillis v. Georgia Dep't of Corrections, 400 F.3d 883, 887-88 (11th Cir. 2005) (concluding that an evaluation that directly disentitled an employee to a raise of any significance was an adverse employment action under Title VII). In Gillis, however, we clarified that the case did not involve disentitlement to a de minimus raise, but, instead, revolved around an employment decision that significantly affected the plaintiff's compensation. See id. at 888. Assuming, as the district court did, that Embry's suspension began as early as 9:00 a.m., with an hourly salary of $11.83, the most compensation lost was $88.73. Thus, this suspension also did not constitute "a serious and material change in the terms, conditions, or privileges of employment." See Davis, 245 F.3d at 1239.

Even if we were to conclude that Embry's one-day suspension involved an "adverse employment action," summary judgment still was warranted on this claim because Embry failed to show that she was treated less favorably than a similarly situated employee outside of her protected class when she was suspended for violating Callahan's fragrance policy. "To show that employees are similarly

19

situated, the plaintiff must show that the 'employees are similarly situated in all relevant respects.'" Knight v. Baptist Hospital of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (quotation omitted). Indeed, "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Wilson, 376 F.3d at 1091 (citing Silvera, 244 F.3d at 1259).[11]

In determining that Morrison—the only comparator identified by Embry—was not similarly situated, the district court properly considered the undisputed evidence that Embry attended a meeting on April 10, 2002, at which the staff was warned that they should not wear any scents or fragrances, and Embry's one-day suspension resulted from Elkins smelling a fragrance on Embry on April 16, 2002. Moreover, although Embry stated during her deposition that she believed that this fragrance policy did not prohibit the use of all fragrances, she did not contest that she was wearing a fragrance on the day in question.

On the other hand, Elkins testified that, upon investigating a complaint she

_____

[11] We note that, in examining claims that employees were disciplined in a disparate manner, we have explained that "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." See Maynard v. Bd of Regents of Universities of Fla. Dept. of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003). Different panels of this Court, however, have determined that this conduct requires "similar" conduct, see e.g. Jones v. Gerwins, 874 F.2d 1534, 1540 (11th Cir. 1989), as opposed to "nearly identical" conduct, see e.g. Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999). See Maynard, 342 F.3d at 1290.

20

received after April 10, 2002, she did not detect cologne on Morrison. Where

employees have engaged in similar conduct, but the supervisor is not aware of one

employee's conduct, this conduct may not be considered in determining whether

the employees are "similarly situated." See Knight, 303 F.3d at 1317 n.5.

Moreover, unlike Embry, Morrison, at least to Elkins, denied knowing about the

policy. See Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000) (concluding

that the plaintiff and another employee were not "similarly situated" when only the

plaintiff admitted to the violation at issue), Thus, whether we apply the "similar"

or "nearly identical" analysis, Morrison was not a proper comparator. See

Maynard, 342 F.3d at 1290.[12] The district court, therefore, did not err in

concluding that no genuine issue of material fact existed on whether Embry

established a prima facie case of disparate treatment.

### b. Retaliation

To the extent Embry also was attempting to establish a prima facie case of

Title VII retaliation, to successfully assert such a claim, a plaintiff must show that

(1) she engaged in statutorily protected expression; (2) she suffered an adverse

---

[12] Even in the absence of evidence showing that a "similarly situated," employee outside of the plaintiff's protected status has been treated differently, a plaintiff still may be able to establish, by circumstantial evidence, a prima facie case of discriminatory animus. See Jones v. Bessemer Carraway Medical Center, 151 F.3d 1321, 1322-24 (11th Cir. 1998). Nevertheless, Embry has abandoned any such argument by not raising it on appeal. See Cooper, 390 F.3d at 734 n.24.

21

employment action; and (3) the adverse action was causally related to the protected expression. See Cooper, 390 F.3d at 740. To be considered an "adverse employment action" under Title VII's anti-retaliation provision, the action "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'" Stavropoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004) (citation omitted), cert. denied, 125 S.Ct. 1850 (2005). "Ultimate employment decisions include decisions such as termination, failure to hire, or demotion." Id. at 617 (citation omitted).

Assuming that Embry's May 2001, complaint and her February 2002, filing of an EEOC charge constituted "statutorily protected expression," the only ultimate employment decisions Embry identified were her February 2002, reprimand and her April 2002, one-day suspension. Similar to the analysis of whether these acts were "adverse employment actions" for purposes of Embry's claims of disparate treatment, Embry failed to explain why these acts, which were not ultimate employment decisions, nevertheless met the "threshold level of substantiality" necessary for a retaliation claim. See id. at 618 (explaining that "not everything that makes an employee unhappy is an actionable adverse action," and that an "adverse employment action" involves conduct that "alters an employee's compensation, terms, conditions, or privileges of employment").

22

Even if Embry's reprimand and suspension were "adverse employment actions," she only needed to show that "the decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) (quotation omitted). Moreover, "[a] plaintiff satisfies this [causation] element if [s]he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (quotation and marks omitted) (reviewing grant of summary judgment in claim filed under the anti-retaliation provision of the Americans with Disabilities Act).

However, this "temporal proximity" must be "very close." Id. "If there is a substantial delay between the protected expression and the adverse action[,] in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." Id. at 1220. Applying this analysis, we concluded in Higdon that a three-month period between the protected activity and the adverse employment action, in the absence of other evidence of causation, was insufficient to establishing a prima facie case of Title VII retaliation. Id. at 1220-21.

In Maniccia v. Brown, 171 F.3d 1364 (11th Cir. 1999), we also concluded that the district court did not err in determining that the employee failed to

23

establish this causation element. Id. at 1370. In Maniccia, the employee was reassigned to a different position 15 months after she filed a sexual harassment grievance against her supervisor, and her employment was terminated 21 months later. Id. at 1369-70. We determined that (1) instead of representing a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to her protected activity; and (2) "[t]he more than 15-month period that elapsed between [her] grievance and the alleged adverse employment actions belie[d] her assertion that the former caused the latter." Id. at 1370. In addition, we explained that the employee failed to show any other evidence suggesting this causation. Id.

Similar to the three-month delay in Higdon, the nine-month gap between Embry's protected activity in May 2001 of complaining of race discrimination to Burleson, and her February 2002 reprimand, was insufficient to establish the requisite causation in the absence of any other evidence of causation. Moreover, in the absence of "a close temporal relationship," Embry failed to produce sufficient alternative evidence showing that her protected activity and this reprimand were "not wholly unrelated." See Gupta, 212 F.3d at 590. Indeed, similar to the facts in Mannicia, Embry did not cite to any other discipline she received between these two events and, thus, failed to show a pattern of retaliatory acts. See Maniccia,

24

171 F.3d at 1370.

More importantly, Elkins was not present when Embry raised her discrimination complaint in June 2001, and Elkins attested that she did not <u>know</u> that Embry complained to Burleson about race discrimination. Embry, therefore, failed to establish that Elkins "was actually aware of the protected expression at the time [she] took adverse employment action." <u>See</u> <u>Brungart v. BellSouth Telecommunications, Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000) (reasoning that "a decision maker cannot have been motivated to retaliate by something unknown to him"); <u>see</u> <u>also</u> <u>Brochu v. City of Riviera Beach</u>, 304 F.3d 1144, 1156 (11th Cir. 2002) (reasoning that "neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge"). Thus, the court also did not err in concluding that no genuine issue of material fact existed on whether Embry successfully alleged a <u>prima facie</u> claim of Title VII retaliation based on her February 2002, reprimand. <u>See</u> <u>Cooper</u>, 390 F.3d at 740.

On the other hand, as the district court concluded, the shorter period time between Embry's filing her EEOC charge on February 15, 2002, and her one-day suspension on April 15, 2002, was sufficiently close to establish causation for purposes of a <u>prima facie</u> case of Title VII retaliation. <u>See</u> <u>Higdon</u>, 393 F.3d at 1220. Moreover, Elkins did not testify that she was unaware of Embry's EEOC

25

charge.  Nevertheless, as discussed below, the district court correctly granted summary judgment on this claim because Embry failed to show that Callahan's articulated reason for imposing the one-day suspension was pretextual.

**Issue 2:      Pretext**

Assuming as the court did that Embry could establish a prima facie case of retaliation based on her suspension claim, Embry argues that the court erred in concluding that she failed to show that Callahan's articulated reasons for its challenged conduct were pretextual.  Embry specifically contends that Callahan's reason for her April 2002, suspension was belied by (1) testimony that other coworkers were not suspended for violating the fragrance policy, and (2) the January 31, 2002, e-mail between Elkins and Bailey that Embry interprets as showing that Elkins would take pleasure in disciplining her.

As discussed above, once a plaintiff successfully alleges a prima facie case of retaliation, and once the employer articulates a legitimate, non-discriminatory reason for the challenged employment action, the plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual.  Sullivan, 170 F.3d at 1059.  In determining whether the plaintiff has met this burden, courts examine whether "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions

26

in the employer's proffered legitimate reasons for its action [exist, such] that a reasonable factfinder could find [all of the reasons] unworthy of credence." Vessels v. Atlanta Independent School System, 408 F.3d 763, 771 (11th Cir. 2005).

As a preliminary matter, to the extent Embry has implied that Callahan's argument that her suspension was based on her violation of the fragrance policy was pretextual because she was wearing a fragrance that had not previously bothered Capps, "Title VII does not take away an employer's right to interpret its rules as its chooses, and to make determinations as it sees fit under those rules." See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984). "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer." See Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (internal quotation and marks omitted).

To the extent Embry also has cited in support of her pretext argument to the fact that Morrison was not suspended, even though he conceded that he wore cologne after April 10, 2002, Embry has correctly asserted that a plaintiff may demonstrate pretext through comparative evidence. See Miles v. M.N.C. Corp.,

27

750 F.2d 867, 870 (11th Cir. 1985). However, as discussed above, Morrison is not a proper comparator because Elkins did not catch him wearing cologne after April 10, 2002. Moreover, Embry failed to identify another proper comparator because, assuming as true Embry's testimony that other coworkers wore fragrances after April 10, 2002, Elkins never caught them wearing a fragrance and, thus, did not believe they were in violation of the policy. See Cooper, 390 F.3d at 740 (explaining that the relevant issue for pretext was not whether the employee actually violated the employer's rule, but whether the employer "honestly believed" that the violation occurred).

To the extent Embry is relying on the contents of Elkins's e-mail to Bailey on February 1, 2002, as evidence of pretext, this e-mail included the following comment by Elkins in response to Bailey's suggestion that Elkins would need to discipline employees violating the policy about not eating during work hours: "I agree . . . want [sic] that be fun, I can't wait." Elkins, however, testified during her deposition that, instead of expressing a retaliatory intent, this comment was intended to be sarcastic because, at the time in question, she was having to spend a lot of energy monitoring employees.

Furthermore, even assuming that this comment was not sarcastic, Embry has failed to explain why this general statement about disciplining the employees in the

28

business office, and which was sent two weeks before Embry filed her EEOC charge, showed that Elkins had an intent to retaliate against Embry for engaging in protected activity. See Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (holding that "[m]ere conclusory allegations and assertions will not suffice" to establish pretext (citation omitted)). We have explained that, although a comment unrelated to a challenged employment decision may contribute to a circumstantial case for pretext, "it will usually not be sufficient absent some additional evidence supporting a finding of pretext." See Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1229 (11th. Cir. 2002) (citations omitted). Thus, assuming that Embry established a prima facie case of retaliation based on her suspension, Embry failed to show that a genuine issue of material fact existed as to pretext.

Accordingly, we conclude that the district court did not err in granting Callahan summary judgment on all of Embry's claims. We, therefore, affirm.

**AFFIRMED.**