United States Court of Appeals,

Eleventh Circuit.

No. 96-6373.

Deborah RANEY, Plaintiff-Appellant,

v.

VINSON GUARD SERVICE, INC., Defendant-Appellee.

Aug. 29, 1997.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV 94-H-2219-NE), James H. Hancock, Judge.

Before HATCHETT, Chief Judge, BIRCH, Circuit Judge, and CLARK, Senior Circuit Judge.

HATCHETT, Chief Judge:

Deborah Raney appeals a district court order granting summary judgment to her employer, Vinson Guard Service, Inc., on a Title VII claim of retaliation. Because Raney did not set forth evidence sufficient to withstand a motion for summary judgment, we affirm the district court's order.

FACTS

The facts that follow are undisputed unless otherwise indicated. On September 20, 1992, Vinson hired Raney as a full-time secretary in its Decatur, Alabama branch office. Several months later, in December 1992, Vinson terminated the Decatur branch manager. Raney assumed the terminated manager's responsibilities for payroll and guard scheduling. After approximately two months, on January 31, 1993, Raney received a new title—"operations coordinator"—and a salaried position. The position of operations coordinator ordinarily involved scheduling and clerical duties, but Vinson gave Raney greater responsibilities, many of which were ordinarily assigned to branch managers. Raney did not, however, receive the title "branch manager" or the associated level of compensation.

According to Raney, sometime after she became operations coordinator she asked her regional supervisor, Gregory Carter, why she was not named branch manager and compensated at a higher level. Raney also asked Carter why she received less compensation and fewer perks than her male subordinates or counterparts. Carter allegedly replied that Vinson's vice president did not

want females in management positions.[1] Carter also allegedly advised Raney to be patient and prove herself. According to Carter, Vinson did not make Raney a branch manager immediately because she lacked experience in the security industry. Ultimately, Vinson promoted Raney to Decatur branch manager in May or June of 1993. As a result of the promotion, Raney became Vinson's only female branch manager in Carter's region.

Despite the promotion, Raney continued to raise concerns with Carter about her pay. During the last pay-related conversation, Raney alleges that Carter told her he could not do anything to resolve her pay concerns, given the views of Vinson's vice-president.[2] Raney also alleges that the following discussion occurred:

> [B]asically—basically, what he [Carter] told me [Raney] was that he had—he had thought about resigning from Vinson but financially he couldn't. He had even spoke[n] with his wife about it and that [sic] he couldn't swallow the things that were going on.

> I explained to him that I didn't expect him to do that for me. I felt like he had gone—I know how far out of his way, and how hard he had fought for me. And I appreciated that. But I didn't expect him to put hi[m]self in that kind of position. But that I, in turn, would have to do what I had to do. And he wanted to know what that meant. I just explained, you know, that if legal action was what it took.... Again, I said, "You do what you have to do and I will do what I have to do." And that was pretty much the way it was left.[3]

According to Raney, Carter's attitude towards her changed markedly after this discussion—"like we [Raney and Carter] were on opposite sides"—and in her next performance review Raney's normally high performance rating fell dramatically from between ninety to a hundred percent down to zero percent. A few weeks after the discussion, Raney also lost her job at Vinson.

[1]Some ambiguity exists in the records and briefs as to whether the Vinson official to whom Raney refers is Vinson's vice-president or president. While we refer to the official here as Vinson's vice-president, our analysis would remain the same if the official is actually Vinson's president.

[2]During oral argument, Raney indicated that this conversation occurred in November 1993, approximately three weeks before she was terminated.

[3]This description of the conversation is found in Raney's deposition, which she submitted in opposition to Vinson's motion for summary judgment. In an affidavit, also submitted in opposition to summary judgment, Raney states categorically that "[a] short time prior to my being fired, I told Mr. Carter that I was going to take legal action, because I considered what they were doing to be discrimination against me because I was a female."

According to Raney, the specific event precipitating her termination was a telephone call the Decatur branch office secretary, Renee Mahathy, made to Carter on November 30, 1993. During the call, Mahathy allegedly told Carter about a statement Raney was drafting to the Equal Employment Opportunity Commission (EEOC).[4] Just a few hours after the alleged call, Carter traveled to Decatur from his office in Birmingham, Alabama. When Carter arrived, he gathered all the Decatur office employees together and conducted a search of every room in the office, ostensibly in search of some missing paperwork. When the search reached Raney's office, Carter discovered the missing paperwork, and after questioning Raney, asked her to turn in her office keys.[5] The following day, December 1, 1993, Carter informed Raney that she was terminated. According to Raney, Carter initially gave no reason for her termination. When pressed, Carter indicated that Raney was terminated for "misconduct," specifically, for authorizing fraudulent payments to employees who had not worked. According to Raney, the misconduct charge was a pretextual ruse to mask a retaliatory termination, as all of the alleged fraudulent payment authorizations were, in fact, legitimate and in accordance with standard company procedures.

Carter's view of the events leading up to Raney's termination differs significantly from Raney's. According to Carter, on November 22, 1993, Vinson's accounting office in New Orleans called and told him that no payroll package had been delivered to headquarters from Raney's branch office. Carter subsequently called Raney to find out what happened to the payroll package. Raney then made inquiries about the missing package. When her staff could not account for the missing package, Raney allegedly told Carter that "obviously, someone has broken into the office and stolen

---

[4]Raney's account of the events that occurred on November 30, 1993, is based in part on the affidavit testimony of a former co-worker, Charlotte Vines Taylor. In her affidavit, Taylor alleges, among other things, that Mahathy told her that she called Carter to tell him that Raney was filling out papers to file an EEOC charge.

[5]According to Raney, she first reported the missing paperwork to Carter on November 29, 1993, when she and Mahathy could not find the paperwork after an exhaustive search of their office. Raney claims Carter responded with an initial expression of concern but then told her not to worry, as the paperwork was available and could be obtained from Vinson's corporate headquarters.

the payroll package."  Accepting Raney's claim as true, Carter told Raney to immediately change the branch office locks and to make only three copies of the new key sets:  one for Carter, one for Mahathy and one for Raney.

According to Carter, a week later, on November 29, 1993, Raney called to inform him about more missing paperwork.  This paperwork included the following:  petty cash receipts, weekly activity reports, marketing reports, payroll register forms, accounts receivable printouts, copies of sales proposals, copies of sales letters, and the master file on a major hospital account.  After quizzing Raney about this second paperwork loss, Carter claims he told Raney that he would decide how to investigate the loss and would then get back in touch with her.  The following day, November 30, 1993, Carter traveled to the Decatur branch office.  En route to the office, Carter claims he called Mahathy and asked her to arrange for the entire office staff to meet him at the office when he arrived.  After he arrived, Carter organized an office search to look for the missing paperwork.  Carter ultimately discovered the paperwork in a briefcase in Raney's office.  When Raney could not, or would not, explain how the missing paperwork got in her office, Carter asked her to turn in her keys and sent her home.  Carter also took Mahathy's keys.

Later that evening, Carter spoke with Vinson's vice-president about the missing paperwork.  During that conversation, Vinson's vice-president allegedly instructed Carter to research the payroll and scheduling information from the Decatur branch office.  On December 1, 1993, Carter allegedly followed orders and began researching the payroll and scheduling information.  After a few hours of investigation, he discovered evidence that purportedly showed that Raney intentionally falsified company payroll records in order to pay employees who had not worked.  Carter then called Raney into the Decatur branch office and informed her that she was terminated.  According to Vinson, the company terminated Raney for a number of reasons, specifically, (1) misconduct regarding the falsification of company payroll documents;  (2) losing numerous documents, including payroll documents and documents containing confidential trade secrets that Vinson did not want its competitors to obtain;  and (3) not performing job duties.

4

PROCEDURAL HISTORY

In January 1994, approximately a month and a half after her termination, Raney filed charges with the EEOC against Vinson. On June 13, 1994, the EEOC issued Raney a notice informing her of her right to sue Vinson. On September 12, 1994, Raney filed a lawsuit against Vinson in the United States District Court for the Northern District of Alabama. Raney's lawsuit alleged one count for employment discrimination on the basis of sex and for retaliation in violation of Title VII of the Civil Rights Act of 1964, § 701 *et seq.,* as amended, 42 U.S.C. § 2000(e) *et seq.;* two counts for breach of contract; and one count for fraud.

On November 30, 1995, Vinson moved for summary judgment on all of Raney's claims. Vinson supported its motion with Carter's affidavit, a number of proposed trial exhibits and its answer to Raney's complaint. On December 21, 1995, Raney filed a number of evidentiary submissions in opposition to Vinson's motion. These submissions included Raney's deposition and affidavit, an affidavit from Charlotte Vines Taylor (Raney's former co-worker) and various proposed trial exhibits. Raney did not include among her submissions any deposition testimony, interrogatory responses or admissions from Carter or Vinson's vice-president. Nor did Raney submit any documentary evidence regarding the scope of Carter's authority as Vinson's regional supervisor. On March 5, 1996, the district court granted Vinson's motion for summary judgment on Raney's Title VII claims. In a separate order, the district court also declined to exercise supplemental jurisdiction over Raney's state law claims for breach of contract and fraud.

The district court divided its memorandum of decision on Raney's Title VII count into two parts. First, the district court granted Vinson summary judgment on Raney's sex discrimination claim because not a "single shred of evidence," other than Raney's bald assertions, supported her claim of unequal treatment based on sex. The district court then granted Vinson summary judgment on Raney's retaliation claim, because Raney offered no "first-hand" or "objective" evidence that Vinson knew about her plan to file a charge or suit against the company. On March 15, 1996, Raney filed a motion pursuant to rule 59(e) of the Federal Rules of Civil Procedure to alter or amend the

district court's order granting Vinson summary judgment. As grounds Raney argued, in part, that the record before the district court contained direct and circumstantial evidence that Carter and/or Vinson knew about her plan to take legal action against the company. The district court denied Raney's motion on March 18, 1996. Raney filed this timely appeal, but has now voluntarily abandoned all claims except her Title VII retaliation claim.

## ISSUE

We address only one issue: whether Raney presented sufficient evidence to create a genuine issue of material fact on her retaliation claim.

## DISCUSSION

### A.

We review the entry of summary judgment *de novo,* applying the same legal standard the district court employed in the first instance. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue exists for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. A genuine issue for trial exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Hairston,* 9 F.3d at 918. The court is not obliged, however, to deny summary

6

judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510.

In a retaliation case such as this one, the plaintiff must show the following to establish a prima facie case: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Hairston,* 9 F.3d at 919. Once the plaintiff has established a prima facie case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Hairston,* 9 F.3d at 919. If the defendant proffers legitimate reasons, the presumption of retaliation is rebutted and drops from the case. At the summary judgment stage, the burden then shifts back to the plaintiff to raise a genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action. *See Hairston,* 9 F.3d at 921 ("The burden to avoid summary judgment is not to show by a preponderance of the evidence that the stated reasons were pretext. Rather, plaintiff's burden ... is met by introducing evidence that ... could allow a jury to find ... that the plaintiff has established pretext, and that the action was taken in retaliation for engaging in the protected activity.").

In this case, the district court based its summary judgment order on the retaliation claim solely on Raney's failure to establish the "causal link" prong of a prima facie case, specifically, Raney's alleged inability to show that Vinson knew about her threatened legal action before making the decision to terminate her. Vinson's articulated rationale for summary judgment on Raney's retaliation claim, however, was based solely on its proffer of legitimate reasons for terminating Raney. On appeal, Vinson reasserts the rationale it asserted to the district court, and, in addition, adopts the rationale the district court relied upon in its memorandum of decision and order. Because we believe the district court's rationale for granting summary judgment is rooted in a correct understanding of the law, we do not reach Vinson's alternative rationale.

B.

7

In order to satisfy the "causal link" prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action. *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993). Since corporate defendants act only through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action. *See Goldsmith,* 996 F.2d at 1162 (general agency principles govern the circumstances in which a principal will be held liable for the acts of its agents under Title VII).

It is not altogether clear which corporate agent took the adverse action against Raney in this case. Arguably, Vinson's vice-president provided the catalyst for Raney's termination when he instructed Carter to research the payroll and scheduling records in the Decatur branch office. Carter actually told Raney she was terminated, so perhaps he too could be viewed as the corporate agent who took the adverse action. In either case, Raney failed to meet her burden to set forth evidence sufficient for a jury to return a verdict for her after a trial.

If Vinson's vice-president was the relevant corporate agent, Vinson is entitled to summary judgment because Raney presented no probative evidence demonstrating that Vinson's vice-president knew of her protected expression. Raney submitted no direct evidence indicating that she told Vinson's vice-president of her threatened legal action. And while we have held that awareness of protected expression may be established based on circumstantial evidence, our cases have required plaintiffs to show a defendant's awareness with more evidence than mere curious timing coupled with speculative theories. *See Goldsmith,* 996 F.2d at 1163 (awareness may be established with circumstantial evidence).

In *Goldsmith,* for instance, we found that the plaintiff, via circumstantial evidence, demonstrated a causal link between her transfer and comments she made threatening to file an EEOC complaint. 996 F.2d at 1163-64. The defendant in *Goldsmith,* the City of Atmore, argued

8

that the plaintiff could not prove that the city's agent, the Mayor of Atmore, knew about a conversation the plaintiff had with a city councilman regarding a possible EEOC complaint. We found this argument unpersuasive because the plaintiff presented deposition testimony from the mayor which impeached his claim of ignorance, as well as evidence demonstrating a curious temporal proximity between her transfer and her conversation about the EEOC. 996 F.2d at 1163-64. Similarly, in *Weaver v. Casa Gallardo, Inc.,* we found that the plaintiff's circumstantial evidence established a causal link where the plaintiff presented testimony "suggesting that management personnel were acutely aware" of the plaintiff's EEOC charge, as well as evidence of a sudden increase in the plaintiff's negative reviews and heightened scrutiny of his job performance. 922 F.2d 1515, 1525 (11th Cir.1991).

In sharp contrast, in this case Raney offered nothing more than an assertion based on a hunch that Carter informed Vinson's vice-president of Raney's plan to file charges with the EEOC.[6] Summary judgment cannot be avoided, though, based on hunches unsupported with significant probative evidence.

If, alternatively, Carter was the relevant corporate agent, Vinson is entitled to summary judgment because Raney offered no probative evidence regarding the scope of authority, if any, Vinson delegated to Carter over Raney. In its answer to Raney's complaint, Vinson expressly denied Raney's allegation that Carter, acting within the line and scope of his authority as agent for Vinson, terminated Raney in retaliation for protected expression. This denial put the scope of Carter's agency in question, and imposed on Raney the burden of establishing that Carter's authority extended to making personnel decisions regarding Raney.

---

[6]We note that Raney has not argued on appeal that Carter—with full knowledge of Raney's protected expression—conspired to engineer Raney's termination and misled Vinson's vice-president to achieve that end. Such an argument, supported with direct or circumstantial evidence, might have presented a very different case. *See Long v. Eastfield College,* 88 F.3d 300, 307-308 (5th Cir.1996) (causal link may be established even though the individual who took the adverse action had no knowledge of the protected expression, if that individual simply rubberstamped the recommendation of another individual who did know of the protected expression).

9

Again, our decision in *Goldsmith* is instructive. In that case, the city argued that it was not liable because the mayor was not covered based on the scope of agency liability established under Title VII. 996 F.2d at 1162 n. 10. We rejected that view and found that the plaintiff could hold the city liable for the mayor's actions "within the scope of his employment." 996 F.2d at 1162. We found that the plaintiff satisfied her burden of proof in this regard because she "elicited evidence that the City had delegated final authority to [the mayor] to make employment decisions." 996 F.2d at 1162. The city, on the other hand, offered no evidence concerning limitations on the mayor's authority. 996 F.2d at 1162. Accordingly, we concluded that based on the evidence, a reasonable fact finder could have found the city liable for the mayor's decision to transfer the plaintiff. 996 F.2d at 1162.

This case presents almost the mirror image of *Goldsmith* in terms of scope of agency evidence. The plaintiff, Raney, failed to establish Carter's authority in the most logical way—with Carter's deposition testimony or copies of the relevant sections of Vinson's employment manual. The sparse evidence that does exist in the record regarding Carter's authority tends to undermine the notion that Carter possessed much, if any, real power over Raney: Vinson's vice-president allegedly posed the obstacle to Raney's promotion and her pay concerns, and Vinson's vice-president ordered Carter's research regarding the payroll and scheduling information from the Decatur branch office. This evidence suggests that Carter functioned as a facilitator or conduit only, while true decision making authority over personnel such as Raney resided with Vinson's vice-president. While the fact that Carter personally informed Raney that she was terminated for misconduct provides some speculative support for a broader view of the scope of Carter's agency, that isolated fact alone is insufficiently probative in light of countervailing facts to satisfy Raney's burden at the summary judgment stage. *See Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (court is not obliged to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable).

CONCLUSION

10

As one commentator recently observed, "in the modern era of summary judgment, the plaintiff is effectively required to put forth her entire case at summary judgment [to] persuade the court that a reasonable fact finder could rule in the plaintiff's favor." Robert J. Gregory, *One Too Many Rivers To Cross: Rule 50 Practice In The Modern Era Of Summary Judgment,* 23 Fla. St. U.L.Rev. 689, 692 (1996). In this case, Raney's burden included the obligation to set forth significant probative evidence regarding the identity, authority and knowledge of the Vinson agent who allegedly terminated her for retaliatory purposes. Raney failed to set forth such evidence, and we thus conclude that no genuine issue exists for trial. Accordingly, we affirm the district court's order.

AFFIRMED.