[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 7, 2008
THOMAS K. KAHN
CLERK

NO. 06-16434

D.C. Docket No. 05-00621-CV-TCB-1

WENDELL BROWN,

Plaintiff-Appellant,

versus

METROPOLITAN ATLANTA
RAPID TRANSIT AUTHORITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(January 7, 2008)**

Before EDMONDSON, Chief Judge, CARNES and FAY, Circuit Judges.

FAY, Circuit Judge:

Wendell Brown ("Brown") appeals from the decision of the district court granting Metropolitan Atlanta Rapid Transit Authority ("MARTA") its motion for summary judgment. Brown, who had been working for MARTA for almost twenty years, alleges that MARTA terminated his employment due to racial discrimination and retaliation based on evidence that MARTA had a practice of retaining and promoting white employees while attempting to get rid of African American employees. After complaining about these practices, Brown was placed on the list for termination and was not rehired, despite being told by MARTA management employees and department heads that he was qualified and had an excellent chance of being rehired. After diligent review of the record, as well as careful consideration of the briefs and oral argument, we conclude that Brown produced direct evidence of racial discrimination and a *prima facie* case for racial retaliation, and reverse and remand the matter for further proceedings.

**Factual Background**

Brown, a black male, began to work with MARTA in January 1984. In August 2001, Brown received his annual performance review from his then supervisor, and was rated as "above standards." In January 2002, Brown transferred to the Quality Assurance ("QA") department and became a QA

2

Engineer.  One month later, Brown's former co-worker, Earl Dendle ("Dendle") became his direct supervisor as Acting Manager and a Lead QA Engineer.[1] During Dendle's eight month tenure as Acting Manager, he hired four people into the Unit, all white.  (Brown Aff. at ¶ 13; Berry Dep. at 303).  Dendle pre-selected them because, in his words, he wanted things back to "the good old days," referring to the staff that was in place before Ms. Marion Clements took over as director.[2]  (Berry Dep. at 296).  This bias is further evidenced by Berry's testimony that Dendle assisted at least two of the QA engineers that he wanted to hire by going over the questions with them and providing reference materials for them to read before the interview, information which was not available to other candidates. (Berry Dep. at 299-303).  In August 2002, Brown received his first annual performance review from Dendle as a QA Engineer.  Brown's overall rating was

---

[1] In 1992 Brown had worked with Dendle and contends that Dendle developed a dislike for him at that time, which continued after Dendle became his supervisor.  (Brown Aff. at ¶¶2,7,11).  Brown alleges that Dendle's hostility toward him was racially motivated.  (Brown Aff. at ¶11).  As Acting Manager, Dendle assigned more projects and reports to Brown than to any other QA employee (Berry Dep. at 50; Brown Aff. at ¶9), he refused to distribute Brown's reports in a timely manner which reflected negatively towards Brown (Berry Dep. at 265-266; Brown Aff. at ¶10) and he was overly critical of the reports submitted by Brown.  After Brown's termination, Dendle was responsible for these reports, but did not know how to complete them, did not submit them in a timely manner, and sometimes did not submit them at all.  (Berry Dep. at 185-187, 189, 221, 275).

[2] Elayne Berry, Manager of the QA department, knew that the candidates were pre-selected because the date of their offer letter was before other candidates were interviewed. (Berry Dep. at 303).

3

"meets standards."[3]  Brown expressed concern to Udeozo Ogbue ("Ogbue"), who was Dendle's boss and Executive Director of QA and Safety.  (Brown Aff. at ¶11; Wilson Dep. Ex. 5 at 423; Ogbue Dep. at 42).  In October 2002, Elayne Berry ("Berry") became Manager of the QA department, taking over Dendle's position.  She received complaints from Brown and other QA Engineers that Dendle's evaluations had been unfair and racially biased, and thus she concluded that it was better for her to do all future yearly evaluations of the QA Engineers instead of the supervisors.  (Berry Dep. at 54-56, 59-60).  Berry then requested that MARTA investigate the allegations against Dendle further, but when this was not done, she removed Brown from Dendle's supervision, and transferred him to work under another Lead Quality Engineer.  (Berry Dep. at 54-56).  In August 2003, Berry rated Brown as "meets standard." (Berry Dep. at Ex. 4-Performance Evaluation).

In the fall of 2003, MARTA developed the Reduction in Force Committee ("RFC") to implement a reduction in workforce ("RIF").  The first step for a department head to take in determining which employees would be laid off was to develop a departmental proposed RIF plan.  (Wright Dep., Ex. 11 at MARTA 1000).  Ralph Eugene Wilson, the head of the Department of Police and Safety

---

[3] According to Brown, this was the average of the "above standards" evaluation from his previous supervisor six months earlier and the "below standards" evaluation from Dendle.

and Quality Assurance ("the Department") of which QA was a subset, delegated authority to Ogbue and Berry to develop this plan. (Wilson Dep. at 17, 25, 31-32). Berry had day-to-day responsibility for the RIF process. (*Id.* at 47-48, 60-61; Ogbue Dep. at 122). Ogbue and Berry proposed the two Lead QA Engineer positions (Grade 20) as the positions to be eliminated from QA. (Wilson Dep. at 36, 59, 69; Berry Dep. at 133-134). The two Grade 20 employees holding the Lead QA Engineer positions were Dendle and Ray Kassinger, both white. (Berry Dep. at 134). Berry submitted these recommendations to the MARTA RIF Committee. (Berry Dep. at 133-134; Wilson Dep. at 35).

The RIF Committee has the duty: (1) to review RIF plans for compliance with MARTA policy/procedure and any applicable laws and regulations, and (2) to concur with the proposed RIF plans from the Departments and route them to the General Manager for approval, or, if the RIF Committee does not recommend approval, to return it to the Department for revision and resubmission. (Wright Dep. at 153, Ex. 11 at MARTA 1000). According to Berry, David Wright, ("Wright"), chair of the RIF Committee for MARTA, told her in response to her proposed RIF recommendations that it had been expressed in the RIF Committee that it would "not be good" to layoff two white employees from a Unit headed by an African American woman. (Berry Dep. at 146,148-149). Wright testified that

he could not recall such. (Wright Dep. at 199-200). However, Berry was certain.

After reviewing the Department's proposed RIF plan, the Committee concluded that the Grade 20 Lead QA Engineer positions would be grouped into a comparative analysis with the Grade 19 QA Engineer positions. (Wright Dep. at 105-106). When she was advised of this plan, Berry informed the RIF Committee that the Grade 19 and 20 job functions were not similar and thus should not be grouped together. The RIF Committee overrode her concerns.[4] (Berry Dep. at 257, 157-158; Wilson Dep. Ex. 3 at MARTA 530-531; Wright Dep. at 113-114.) The RIF Committee then directed the Department to do a comparative analysis of the Grade 19 and 20 Engineers pursuant to the procedure outlined in the RIF Policy. (Berry Dep. at 157-158). Before performing the comparative analysis, Berry informed the RIF Committee that Dendle had not objectively evaluated Brown on his 2002 yearly evaluation and suggested that all of the 2002 evaluations completed by Dendle should be disregarded for RIF purposes. The Committee refused. (Berry Dep. at 157-158, 79-80). Following the analysis, the Department recommended Ray Kassinger (white) and William Montgomery (black) for layoff. (Berry Dep. at 158). Brown was still not recommended for

---

[4] MARTA does not recall why the Committee disregarded this information and MARTA has no documentation to evidence why MARTA decided to lump the Grade 19 and 20 engineers together. (Wright Dep. at 192-193).

layoff.

During this time, Brown had heard about lunch meetings where MARTA employees, including Adele Clements, a manager within Brown's department, discussed getting rid of African American employees. (Berry Dep. at 177; Dendle Dep. at 98-100). In December 2003, Brown discussed this with Michael Sloan, ("Sloan"), MARTA's Chief Legal Officer and Assistant General Manager. (Brown Aff. at ¶ 15; *see also* Dendle Dep. at 103 (testifying that he could not remember one way or the other whether such racial discussions occurred during the lunch meetings)). Shortly, after this conversation, Sloan instructed the RIF Committee that Brown could be added to the list for possible layoff. (Berry Dep. at 165, 256). Without any further consultation with the Department, the RIF Committee engaged in an abridged RIF analysis and concluded that two African American employees would be laid off, including Brown. (MARTA Letter to Brown at 1-2; Wilson Dep. Ex. 3 at MARTA 531; Brown Aff. at ¶ 16).

Immediately after Brown's termination, both Wilson and Berry told Brown that they believed he would be rehired by MARTA and that he was the front runner for a contract position with MARTA through its general contractor, Regional Transportation Partners ("RTP"). (Brown Aff. at ¶¶16, 17; Brown Dep. at 33-35). On January 9, 2004, Berry and Ogbue signed Brown's termination

7

record specifying that he was terminated due to "Staff reduction/Lay off," but his "Overall Job Performance" was satisfactory[5], and that they would recommend him for rehire by the Department and by MARTA. (Berry Dep. at 169; Wilson Dep. at Ex. 7). On January 13, 2004, Brown met with Sloan for a second time where he discussed again, among other things, his concerns about the lunch meetings. (Brown Aff. at ¶ 16). The day after this meeting, Ogbue changed Brown's termination record from indicating Brown was "eligible for rehire" to indicating he was "not eligible for rehire." (Berry Dep. at 170-171). In addition, he changed Brown's termination record from stating that Brown's performance was "satisfactory" to stating it was "unsatisfactory." (*Id*; Wilson Dep. at Exs. 7,8). Then sometime prior to discovery in this case, Brown's termination record was changed again to reflect that he was "eligible for rehire," but continued to reflect that his job performance was unsatisfactory.[6] (Wilson Dep. at Ex. 9). In addition, even though MARTA had requested RTP to hire Brown for one of its positions, Berry testified that Mr. Ogbue went to RTP directly and asked that they not fill

---

[5] For purposes of the summary judgment, MARTA does not dispute that Brown's performance was satisfactory. (MARTA's pleading showing authorities for summary judgment, pg. 9).

[6] Wilson, Ogbue, and Berry, the MARTA employees responsible for filling out the form, testified that they had never seen this third version before they were deposed. (Berry Dep. at 173; Wilson Dep. at 121; Ogbue Dep. at 159-160).

that request.  (Berry Dep. at 103-105).

After his termination, Brown applied for eight positions with MARTA, two before filing his EEOC charge.  As to these first two positions, Brown received notice from MARTA that he was qualified for one (Director of Wayside Maintenance), but not the other (Superintendent-Rail Line).  (Berry Dep. at 194). With regards to the six other positions Brown applied for after filing the EEOC charge, Brown received notice that he was qualified for two positions, Contract Professional–Safety & Quality Assurance and Contract Employee– Safety Certification Engineer.  (Brown Aff. at ¶25).  On March 4, 2005, Brown filed an employment discrimination action against MARTA claiming racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*, 42 U.S.C. §1981 and 42 U.S.C. §1983, respectively, as well as a state law claim for intentional infliction of emotional distress against MARTA.  The district court granted MARTA's motion for summary judgment because Brown failed to establish a *prima facie* case for either racial discrimination or retaliation.  This appeal followed.

**Discussion**

"We review the trial court's grant or denial of a motion for summary judgment *de novo*, viewing the record and drawing all reasonable inferences in the

light most favorable to the non-moving party." *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002).

*A. The Discrimination Claim*

If "a plaintiff produces direct evidence of a discriminatory motive, and the trier of facts accepts this testimony the ultimate issue of discrimination is proven." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997); *Trotter v. Board of Trustees of Univ. Of Ala.*, 91 F.3d 1449, 1453 (11th Cir. 1996) ("When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available."). "[I]n cases of discrimination proved by direct evidence, it is incorrect to rely on the *McDonnell Douglas* test because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas*, no such inference is required in the case of direct evidence." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1104 (11th Cir. 2001) (quoting *Taylor v. Runyon*, 175 F.3d 861, 867 n.2 (11th Cir. 1999).

Brown's Department RIF Committee recommended two unit employees who should be laid off. They were both white. Thereafter, Wright, the chairman

**10**

of the RIF Committee for MARTA, told Berry, the co-chair of the RIF Committee for the Department of Police and Safety and Quality Assurance that during a meeting of the RIF Committee it had been expressed that it would "not be good" to layoff two white employees from a Unit headed by an African American woman. (Berry Dep. at 146, 148-149).[7] Only then did the RIF Committee determine that two African American employees, including Brown would be laid off instead of the two whites previously recommended. (Berry Dep. at 146, 148-149). This is strong direct evidence that racial bias was involved in MARTA's decision to terminate Brown's employment. This is a discussion held between senior employees of MARTA directly involved in the decision making process. *See Bass*, 256 F.3d at 1105; *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) ("[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race] . . . constitute direct evidence of discrimination.") (quotation marks omitted).

---

[7] This statement constitutes an admission by a party opponent because under Fed. R. Evid. 801(d)(2)(D), "a statement by [a] party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, . . . is deemed an admission by a party opponent and is excluded from the definition of hearsay." *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 557 (11th Cir. 1998). Furthermore, "because Fed. R. Evid. 801(d)(2)(D) does not define the term [']agent,['] we must assume that Congress intended to refer to general common law principles of agency when it used the term. At common law, senior officers of a corporation normally are agents and servants of the corporation." *Id.* at 558 n.9.

Moreover, even without that direct evidence, clearly, Brown has produced sufficient evidence, which if believed, would establish a *prima facie* case for discrimination pursuant to the *McDonnell Douglas* factors. "To state a *prima facie* case of racial discrimination [under *McDonnell Douglas*], a plaintiff must show (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected, and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Terry v. Cook*, 866 F.2d 373, 379 (11th Cir. 1989) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824 (1973). "The burden then . . . shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802.

The first prong of the test is clearly satisfied because Brown is an African American. The second prong is also satisfied in that upon his termination both Berry and Wilson informed Brown that he had an excellent chance of being rehired by MARTA, and that he was the front runner for a contract position with MARTA through its general contractor. (Brown Aff. at ¶¶16, 17; Brown Dep. at 33-35). In addition, the record evidence shows that MARTA determined Brown

**12**

was qualified for a position for which he had applied before filing the EEOC complaint–Director of Wayside Maintenance–and two positions for which he had applied after filing the EEOC complaint–Contract Professional–Safety & Quality Assurance and Contract Employee–Safety Certification Engineer. (Brown Aff. at ¶25; *see* Escandon Aff.; Harris Aff.).

Likewise, the third prong is satisfied. Brown applied for a total of eight positions after his termination and was never rehired, despite qualifying for at least three positions. Finally, the fourth prong is satisfied because after rejecting Brown, MARTA continued to seek other applicants and ultimately hired other people for the positions for which Brown was qualified.

This record includes sufficient evidence to establish a *prima facie* case for racial discrimination and therefore genuine issues of material facts precluding the entry of a summary judgment.

*B. The Retaliation Claim*

To establish a *prima facie* showing of retaliation under Title VII,[8] a plaintiff must demonstrate: "(1) that [he] engaged in a statutorily protected expression; (2)

---

[8] Title VII considers it an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

that [he] suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004).

The first prong of the test is satisfied in this case. In *Little v. United Technologies*, this Court held that in order to be a statutorily protected expression, "the opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." 103 F.3d 956, 959 (11th Cir. 1997). The district court held that Brown has not made such a showing and, thus, his complaint about the Pizza Hut meetings was not protected activity. We disagree. In December 2003, Brown discussed with Michael Sloan, MARTA's Chief Legal Officer and Assistant General Manager, that he had heard about lunch meetings where MARTA employees discussed getting rid of African American employees. (Brown Aff. at ¶ 15). This case, unlike *Little,* opposes the routine discriminatory practice of management employees, particularly Dendle and Clements', and not action or comments from co-workers to co-workers. This evidence accounts for Brown's state of mind[9] because he was concerned that

---

[9] The evidence that the lunch meetings included discussions of getting rid of black employees and retaining and promoting whites is Berry's deposition testimony about what Clements and Dendle told her. This is not hearsay because it need not be offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c); *U.S. v. Schlei*, 122 F.3d 944 (11th Cir. 1997) (Evidence regarding witness' testimony at her deposition was not hearsay where testimony was offered to demonstrate defendant's state of mind.). Whether or not it is true, it was the reason

discriminatory practices were going on. (Berry Dep. at 177).

_____This Court in *Little*, stated that even if conduct complained about is not unlawful, a plaintiff can establish a *prima facie* case of retaliation under Title VII if he had "an objectively reasonable belief that he opposed an unlawful employment practice." 103 F.3d at 960. "A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Id.*

There is ample evidence to show that Brown had a reasonable basis for a subjective good faith belief that he took part in statutorily protected expression. *See Clover v. Total Sys. Serv., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (protected expression element satisfied where court had no reason to doubt plaintiff did not have a good faith, reasonable belief he was engaging in statutorily protected expression). In fact, Brown submitted a supplemental affidavit explaining that he believed he was opposing an act of unlawful racial discrimination. *See* 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b) (district court may consider additional evidence upon receipt of Magistrate Judge's recommendation). After reviewing the facts, Brown's good faith belief was also

Brown went to Sloan to complain.

**15**

objectively reasonable because a detached individual could easily have interpreted this cumulative evidence as an indication of an unlawful employment practice.

The second prong of the test is also satisfied because Brown suffered adverse employment action after his complaint. According to the Supreme Court, a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse[.]" *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (noting that the standard is phrased in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. *Context matters*.") (emphasis added). The Court has stated that "in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks omitted). Shortly after Brown's discussion with Sloan, MARTA's Chief Legal Officer and Assistant General Manager, Sloan instructed the MARTA RIF Committee that Brown could be added to the list for possible layoff. Then, a day after Brown's second meeting with Sloan, Ogbue changed Brown's termination record from indicating he was "eligible for rehire" to indicating he was "not eligible for rehire." Ogbue also changed Brown's termination record from stating that Brown's performance was "satisfactory" to stating it was "unsatisfactory."

**16**

Taking this in context, we believe that MARTA's changes to Brown's employment record constituted significant adverse action. Brown was terminated after almost twenty years of employment with MARTA, and upon his termination two MARTA management employees informed him that he had an excellent chance of being rehired by MARTA and even identified a specific position for him. (Brown Aff. at ¶¶16, 17; Brown Dep. at 33-35). We believe a jury could conclude that had Brown known that his complaint of discrimination would lead to his employment record being changed to "not eligible for rehire" and/or "performance unsatisfactory" he would have been dissuaded from making such a complaint, as would any other reasonable person.

To satisfy the third prong for retaliation, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (internal quotation marks omitted). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Clover*, 176 F.3d at 1354; *Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1197 (11th Cir. 1997). This awareness may be established either by direct or circumstantial evidence." *Clover*, 176 F.3d at 1354; *Bass*, 256 F.3d at 1119 (stating that to establish a causal connection, the decision maker's

awareness of the protected activity might be established by circumstantial evidence, such as "close temporal proximity between the protected activity and the adverse action"); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (*"[I]n the absence of other evidence tending to show causation"* a party might establish causation by showing a very close temporal proximity between the protected activity and the adverse action).

Brown has satisfied the third prong. Brown cited record evidence that shortly after his first complaint to Sloan, Sloan instructed the MARTA RIF Committee that Brown could be added to the list for layoff. (Berry Dep. at 165 and 256). Then unfavorable changes to his employment record were made one day after Brown's second complaint to Sloan. All of this was done after Berry and Wilson had indicated to Brown that he was the front runner for a contract position with MARTA. (Brown Aff. at ¶¶16, 17; Brown Dep. at 33-35). In addition, there is evidence that after Brown's conversation with Sloan, MARTA, through Ogbue, convinced its general contractor to reject Brown for a job. (Berry Dep. at 103-105). Finally, after his termination, Brown applied for a total of eight positions with MARTA, and was never rehired. We conclude that there is a sufficient basis to find that MARTA's refusal to rehire Brown was not "wholly unrelated" to his complaints of discrimination. Thus, we believe that Brown has established a

*prima facie* case for retaliation as well.

## Conclusion

Because Brown has established a *prima facie* case for both racial

discrimination and retaliation, we **REVERSE** the district court's order granting

summary judgment.  The summary judgment is **VACATED** and the matter

**REMANDED** for further proceedings consistent with this opinion.